191 S.W.3d 428 (2006)
Rafael Javier RODRIGUEZ, Appellant,
v.
The STATE of Texas, Appellee.
No. 13-02-607-CR.
Court of Appeals of Texas, Corpus Christi-Edinburg.
April 7, 2006.
*435 Rolando Garza, McAllen, for appellant.
Theodore C. Hake, Asst. Crim. Dist. Atty., Amy Howell Alaniz, Asst. Dist. Atty., Edinburg, for appellee.
Before the court en banc.

OPINION
Opinion by Justice YAÑEZ.
A jury found appellant, Rafael Javier Rodriguez, guilty of intoxication assault[1] and sentenced him to six years of imprisonment and a $10,000.00 fine. By eleven issues, appellant challenges (1) the legal and factual sufficiency of the evidence to support his conviction (issues one and two); (2) the trial court's denial of his motion to suppress on grounds (a) he was unlawfully arrested (issue three) and/or (b) he was unlawfully detained (issue four); (3) admission of the videotape in violation of articles 38.22 and 38.23 of the code of criminal procedure (issue five); (4) admission of his refusal to take a breath test at his residence on grounds that (a) his continued detention was unlawful (issue six) and (b) he was not given the statutory warnings required to take a breath sample if he was under arrest, and if he was not under arrest (as the State argues), the request for a breath sample was improper (issue seven); (5) the exclusion of two photographs from evidence (issue eight); and (6) the denial of his motion for new trial on grounds that (a) the State failed to disclose evidence favorable to his defense (issue nine), (b) the newly-discovered favorable evidence likely would have changed the outcome of the trial (issue ten), and (c) his trial counsel was ineffective for failing to discover the favorable evidence (issue eleven). We affirm.

*436 I. Background[2]
At approximately 9:30 p.m. on the evening of November 8, 2001, appellant, then a municipal judge in Elsa, Texas, was driving a van on FM 88 near his residence in Elsa. The van struck a motorcycle driven by Linda Perez. At trial, Officer Jaime Cano testified that he was the first police officer to arrive at the scene of the accident. Cano testified that when he arrived, he observed the motorcycle, missing its front wheel and driver, on the side of the road, approximately seventy-five feet from the van. Onlookers gathered at the scene reported that Perez was pinned underneath the van. EMS and fire department personnel removed Perez from under the van. Cano testified that Perez had suffered severe injuries and that she was airlifted from the scene for emergency treatment.
After one of the onlookers identified appellant as the driver of the van, Officer Cano approached appellant and asked him what had occurred. Appellant said he thought he had hit a dog. Cano directed appellant to sit in Cano's police car. Officer Ricardo De Hoyos arrived and directed Officer Flavio Garcia to transport appellant to the police station in order to conduct a field sobriety test on appellant. Garcia testified that he drove appellant to the police station in Cano's police car; he was unaware that a video camera inside the car recorded his conversation with appellant during the drive. De Hoyos testified that at the station, he conducted three field sobriety tests on appellant, which appellant passed. Elsa Police Chief, Primitivo Rodriguez, testified that he observed only one of the field sobriety tests at the station and that appellant passed the test. Shortly thereafter, appellant was released and was driven home by a friend, the Honorable Espiridion ("Speedy") Jackson, a justice of the peace for Hidalgo County at that time.
Officer J.P. Rodriguez testified that at the time, he was the only Elsa police officer certified to conduct field sobriety tests. According to Officer Rodriguez, when he arrived at the police station, appellant had been released. After Officer Rodriguez advised the Chief that Officer De Hoyos was not certified to conduct field sobriety tests, the Chief ordered Officer Rodriguez to go to appellant's house to conduct another field sobriety test and obtain a blood or breath specimen from appellant. Officer Rodriguez testified that approximately an hour and forty minutes after the accident, he arrived at appellant's residence and performed three additional field sobriety tests, which appellant passed. Officer Rodriguez testified that he attempted to read appellant the required statutory warnings, but he was unable to do so because appellant kept interrupting. Officer Rodriguez testified that he requested that appellant provide either a breath or blood sample, but appellant refused.

II. Legal and Factual Sufficiency
In his first and second issues, appellant contends the evidence is legally and factually insufficient to support his conviction.

A. Standard of Review
In a legal sufficiency review, we view all of the evidence in the light most favorable to the verdict and then determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3] This *437 standard gives "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[4]
We measure the legal sufficiency of the evidence against the elements of the offense as defined by a hypothetically correct jury charge for the case.[5] "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."[6]
The jury, as the trier of fact, may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when giving effect to the inferences that may be reasonably drawn from the evidence.[7] As fact finder, the jury is the exclusive judge of the credibility of witnesses and the weight to be afforded their testimony.[8] The jury is free to accept one version of the facts, reject another, or reject all or any of a witness's testimony.[9]
In a factual sufficiency review, we view all of the evidence in a neutral light, and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met.[10] We are not bound to view the evidence in the light most favorable to the prosecution, and may consider the testimony of all the witnesses.[11] Disagreeing with the fact finder's determination is appropriate only when the record clearly indicates that such a step is necessary to arrest the occurrence of a manifest injustice; otherwise, due deference must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence.[12]
Here, appellant was convicted of intoxication assault. Thus, a hypothetically correct jury charge would ask the jury if (1) appellant (2) operated a motor vehicle (3) while intoxicated, and (4) by reason of that intoxication, (5) caused serious bodily injury to another.[13]

B. Analysis

1. Legal Sufficiency
In his first issue, appellant challenges the legal sufficiency of the evidence to support his conviction. Specifically, he *438 contends the evidence is legally insufficient to support the elements of either (1) intoxication or (2) causation (that the accident was caused by reason of that intoxication).[14] The State contends the evidence is legally sufficient to support appellant's conviction.
Officer Cano testified that when he approached appellant at the scene of the accident and escorted him to his police car, he observed that appellant was staggering badly and smelled strongly of alcohol. According to Cano, appellant was staggering so badly that he had to hold on to Cano's shoulder to keep from falling down. He also testified that when he looked inside appellant's van, he observed an open twenty-four-ounce can of beer on the driver's side of the front console. He also observed three unopened cans of beer on the floorboard behind the driver's seat. Cano testified that he prepared an accident report based on all the information he obtained investigating the accident. According to the report, appellant was traveling southbound on FM 88, attempted to turn left, and failed to yield the right-of-way to the motorcycle, causing the accident.
Officer De Hoyos testified that when he first encountered appellant at the scene, appellant was sitting in Cano's police car and smelled strongly of alcohol. At the trial, De Hoyos initially testified that he did not request a breath sample from appellant at the station, but after being reminded of his grand jury testimony, he testified that he did ask appellant twice to submit to a breathalyzer test, but that appellant refused.
Officer Garcia testified that during the ride to the police station, appellant said that the motorcycle did not have its lights on and that he thought he had hit a dog. When they arrived at the station, appellant asked Garcia if he smelled like beer. Garcia testified that at the station, he observed the second round of sobriety tests administered to appellant and, in his opinion, appellant did not "pass" the tests because he was leaning on a filing cabinet. Garcia testified that, in his opinion, appellant did not have the normal use of his physical or mental faculties at the time the tests were administered.
Officer J.P. Rodriguez testified he did not encounter appellant at the scene because appellant had already been taken to the station. He did observe, however, that the interior of the van smelled strongly of alcohol, the open can of beer in the driver's front console, and the unopened cans behind the driver's seat. He also testified that the open can of beer appeared to be full because he observed condensation on the outside of the can. Rodriguez testified that appellant later told him that he had consumed two to four beers prior to the accident.
Appellant testified that he did not see the motorcycle, but "felt something hit the van" when he turned. Appellant testified that he later said the motorcycle's lights were out and that he thought he had hit a dog.
Perez, the victim, testified that she is a motorcycle safety instructor and that the headlight and two driving lights on her motorcycle come on automatically. Perez testified that when the collision occurred, appellant's van was traveling south on FM 88, but was in the northbound lane.
Viewing this evidence in a light most favorable to the verdict, we hold a jury could rationally conclude that appellant was intoxicated and that the accident was caused by that intoxication. We overrule appellant's first issue.

*439 2. Factual Sufficiency

By his second issue, appellant contends the evidence is factually insufficient to support the elements of (1) intoxication and (2) causation (that the accident was caused by reason of that intoxication).
In addition to the evidence cited above, we note the following evidence relied upon by appellant.
Officer De Hoyos testified that at the police station, he performed three field sobriety tests on appellant and that appellant passed all three tests. De Hoyos testified that he conducted a second field sobriety test in the presence of Chief Rodriguez. After appellant passed the second test, Chief Rodriguez ordered that appellant be released. Similarly, Chief Rodriguez testified that he was present when appellant took one of the field sobriety tests and that appellant passed the test. Officer J.P. Rodriguez testified that approximately an hour and forty minutes after the accident, he conducted an additional three field sobriety tests at appellant's residence, and appellant passed the tests. Appellant testified that he had only consumed one beer the night of the accident and that he was not intoxicated. According to appellant, the beer that was found in the driver's front console was not his, but belonged to his friend, Speedy Jackson. Jackson testified that he and appellant were together at a barbecue earlier in the evening and that he had consumed several beers; however, he did not recall whether he saw appellant drinking. Appellant denied that he was in the wrong lane when the accident occurred.
In conducting a factual sufficiency review, an appellate court must avoid substituting its judgment for that of the factfinder and must not intrude upon the factfinder's role as the sole judge of the weight and credibility given to witness testimony.[15] We hold that a neutral review of the evidence demonstrates that the evidence is factually sufficient to support the jury's verdict. We overrule appellant's second issue.

III. Motion to Suppress
In his third issue, appellant contends the trial court erred in denying his motion to suppress because he was arrested without probable cause. Appellant argues the trial court should have suppressed "the fruits of everything derived from [his] unlawful arrest," including the videotape in the police car, the events at the police station, and any refusals to submit to a breath test at the police station or later at appellant's residence. Appellant argues the evidence should have been excluded pursuant to the Fourth Amendment to the United States Constitution and article 38.23 of the Texas Code of Criminal Procedure.[16]
Similarly, in his fourth issue, appellant contends that the trial court erred in denying his motion to suppress because his detention was unlawful. Appellant argues that pursuant to the Fourth Amendment and article 38.23 of the code of criminal procedure, the trial court should have excluded the "fruits of everything derived from [his] unlawful detention," including the videotape in the police car, the events at the police station, and any refusals to submit to a breath test at the police station or later at appellant's residence.

A. Standard of Review and Applicable Law
A trial court's ruling on a motion to suppress is generally reviewed for *440 abuse of discretion.[17] In a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony.[18] In reviewing a trial court's ruling on a motion to suppress, we afford almost total deference to the trial court's determination of the historical facts that the record supports, especially when the trial court's findings turn on evaluating a witness's credibility and demeanor.[19] We afford the same amount of deference to the trial court's ruling on "application of law to fact questions," also known as "mixed questions of law and fact," if resolving those ultimate questions turns on evaluating credibility and demeanor.[20] However, we review de novo questions of law and "mixed questions of law and fact" that do not turn on an evaluation of credibility and demeanor.[21]
We uphold a trial court's ruling on a suppression motion if it is reasonably supported by the record and is correct on any theory of law applicable to the case.[22]

B. Custody

1. Applicable Law
As a general rule, a person is not in custody under Miranda[23] during a routine traffic stop.[24] Detention and questioning by police officers during a DWI investigation, without more, is not custody.[25] A motorist is not in custody under Miranda "during a routine traffic stop for suspicion of DWI because the circumstances do not place the driver completely at the mercy of police."[26] "[T]he prophylactic warnings required by Miranda do not attach until the officer has objectively created a custodial environment and has communicated to the accused his intention to effectuate custody to the accused himself."[27]
In determining whether an individual was in custody, the ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.[28] The determination depends on the objective circumstances, not on the subjective views of either the interrogating officers or the person being questioned.[29] Moreover, *441 the determination is made on an ad hoc basis.[30] Custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest.[31] An "arrest" occurs "when a person's liberty of movement is successfully restricted or restrained, whether this is achieved by an officer's physical force or the suspect's submission to the officer's authority."[32] An arrest is complete only if "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with a formal arrest."[33] The subjective intent of either the police officer or the defendant is irrelevant.[34]
The court of criminal appeals has outlined some general situations that may constitute custody, including the following: (1) when the suspect is physically deprived of his or her freedom of action in any significant way, (2) when a law enforcement officer tells the suspect he or she cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his or her freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect he or she is free to leave.[35] In the first, second, and third situations, the restrictions upon freedom of movement must rise to the degree associated with an arrest as opposed to an investigative detention.[36] With regard to the fourth scenario, the officers' knowledge of probable cause must be manifested to the subject.[37]
The fact that an appellant becomes the focus of a DWI investigation does not automatically convert an investigatory detention into an arrest and custodial interrogation.[38] An officer's knowledge of probable cause to arrest for a DWI does not automatically establish custody.[39] Numerous cases hold that the mere handcuffing of a suspect does not automatically transform an investigative stop into a full-blown arrest.[40]
When a person is transported to a law enforcement facility by an officer in the course of an investigation, if the *442 person was acting upon the invitation, request, or even the urging of an officer, and there were no threats that he would be taken in a forcible manner, and the accompaniment is voluntary, then the individual is not in custody.[41] Station-house questioning alone does not constitute custody.[42] However, police conduct during the encounter may cause a consensual inquiry to escalate into a custodial interrogation.[43]
The Texas Court of Criminal Appeals stressed in Davis v. State, 947 S.W.2d 240, 245 (Tex.Crim.App.1997), that an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, and the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.[44] "The propriety of the stop's duration is judged by assessing whether the police diligently pursued a means of investigation that was likely to dispel or confirm their suspicions quickly."[45] Thus, the constitutional considerations for post-stop investigations are whether the detention was too long in duration, whether police officers diligently pursued means of investigation that were likely to confirm or dispel their suspicions quickly, and whether police officers were unreasonable in recognizing less intrusive alternative means by which their objectives might have been accomplished.[46] "[A]n investigative detention implies that the obtrusive act is for the purpose of actually investigating. Thus, where no investigation is undertaken[,] the detention cannot be considered investigatory and rises to the level of an arrest."[47]

2. Testimony
Here, Officer Cano testified that he was the first police officer to arrive at the scene of the accident. After Officer Cano assisted emergency personnel in removing the victim from underneath the van, Cano approached appellant and asked him what happened. Cano testified that appellant said he thought he had hit a dog. Cano further testified that he directed appellant toward his police car and while walking to the car, he noticed appellant smelled strongly of alcohol. Cano also testified that appellant was staggering so badly that he had to hold on to Cano's shoulder to keep from falling down. Cano testified he did not conduct field sobriety tests at the scene of the accident because he was not certified to do so. He also testified he did not call an outside law enforcement entity (such as DPS) to assist in conducting such tests because his boss, Chief Rodriguez, told him not to do so.[48] Cano *443 testified that because he was concerned for appellant's "safety," he directed appellant to sit in his police car. Cano testified that he did not consider appellant under arrest when he told him to sit in the police car.
Officer De Hoyos was the second police officer to arrive at the scene of the accident. De Hoyos testified that he encountered appellant when appellant was escorted to Cano's police car. De Hoyos testified that he smelled alcohol on appellant's breath. De Hoyos ordered Officer Garcia to transport appellant to the police station so that a field sobriety test could be conducted on appellant.[49] De Hoyos testified he did not want to conduct the field sobriety tests at the scene because there were "a lot of people" there and his "main concern was safety." De Hoyos testified that even though the accident occurred in front of appellant's home, he would not have allowed appellant to go home or otherwise leave the scene of the accident. De Hoyos testified he did not arrest appellant at the scene and did not tell appellant he was under arrest. De Hoyos testified that he called DPS, even though Chief Rodriguez had told him not to do so. A DPS trooper eventually arrived at the police station, but did not perform any sobriety tests on appellant because he had already been released.
Officer Garcia testified that he transported appellant to the police station as ordered by Officer De Hoyos. Garcia testified he was told to take appellant to the station before any DPS troopers arrived. Garcia testified he was simply following orders and did not know why appellant was being taken to the station. Garcia testified that if appellant had asked to be released on the way to the station, he would have called De Hoyos and asked for instruction. Garcia testified he did not tell appellant he was under arrest and did not tell him he was free to leave. Garcia testified that at the station, appellant was taken to the booking room, which is normally used for suspects that have been placed under arrest. Garcia testified that he did not observe the first round of field sobriety tests that De Hoyos administered to appellant at the station, but observed the second round of tests. Garcia testified that, in his opinion, appellant did not "pass" the second round of tests because he was leaning on a filing cabinet during the tests. Garcia testified that in his opinion, appellant did not have the normal use of his physical or mental faculties at the time the tests were administered.
Appellant testified that Officer Cano put him in a police car at the scene and told him he (Cano) "would have to take [appellant]." Appellant testified that the officer told appellant's wife that "he would have to take me in." Appellant testified that in walking to the police car, he stumbled over a cable. According to appellant, "nobody asked [him] anything" at the scene. Officer Garcia told appellant that he was going to take appellant to the police station. Appellant testified he did not feel free to leave. Appellant was at the station for approximately twenty minutes and was not told that he could leave. Appellant thought he was under arrest. Appellant testified he did not refuse to submit to a breath test at the station because he was not asked to submit to such a test. Appellant testified he was told that a DPS trooper was en route to the station and that he was going to submit to a breathalyzer test when the trooper arrived, but that Chief Rodriguez released him before the trooper arrived.

*444 3. Analysis

Officers Cano and De Hoyos both testified that they smelled alcohol on appellant's breath. An open can of beer was found in the driver's side front console.[50] The officers investigating the accident knew that the victim, Perez, had suffered serious injuries.[51] On these facts, the issue requiring investigation was whether appellant was intoxicated. The record reflects, however, that the officers did not actually attempt to investigate this issue at the scene. The investigating officer did not question appellant as to whether he had been drinking and, if so, how much alcohol he had consumed. The "least intrusive means" available to determine if appellant was intoxicated was to conduct a field sobriety test at the scene of the accident. Although Officer Cano testified that he did not do so because he was not certified to conduct such tests, he also testified that he called Officer J.P. Rodriguez, the only City of Elsa police officer certified to conduct such tests, to the scene. Officer Rodriguez testified that he arrived at the scene approximately five to eight minutes after he was called, but that appellant had already been taken to the police station. When Officer De Hoyos was asked why he did not conduct a field sobriety test at the scene of the accident, he said there were "a lot of people" and his "main concern was safety." However, there is no evidence in the record that conducting a field sobriety test at the scene would have presented a significant safety risk. There were four officers present at the accident scene: Officers Cano, De Hoyos, Garcia, and Chief Rodriguez. In addition, Officer J.P. Rodriguez arrived at the scene a few minutes after he was called. On these facts, we conclude that the officers failed to investigate whether appellant was intoxicated at the scene and failed to employ the "least intrusive means reasonably available to verify or dispel [their] suspicion in a short period of time."[52] Because the investigative questioning (conducting field sobriety tests) did not occur until after appellant was transported to the police station, we conclude that the investigative detention of appellant at the scene escalated into custody when he was taken to the station.[53]

C. Probable Cause
Having determined that appellant was taken into custody when he was taken to the police station, we turn to whether the officers had probable cause to arrest or take appellant into custody for (1) driving while intoxicated or (2) any other offense.

1. Applicable Law
Law enforcement officers have the authority to investigate a car accident.[54] During the investigation, an officer must develop additional facts constituting *445 probable cause to arrest an individual for driving while intoxicated.[55] In order to make a full custodial arrest, an officer must have probable cause to believe the person he is arresting has committed or is committing an offense.[56] Probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a particular person has committed or is committing an offense.[57]

2. Analysis
Here, Officer Cano testified that (1) appellant acknowledged he was the driver of the vehicle and that he thought he had hit a dog, (2) appellant smelled strongly of alcohol, (3) appellant was staggering so badly he had to hold onto the officer for support, and (4) there was an open 24-ounce can of beer on the driver's side of the front console. Officer De Hoyos testified that he smelled alcohol on appellant's breath. Appellant argues that this type of evidence constitutes only reasonable suspicion to justify further investigation, but is insufficient, without additional evidence, to constitute probable cause to arrest for driving while intoxicated. Appellant cites Rubeck v. State, 61 S.W.3d 741, 745 (Tex. App.-Fort Worth 2001, no pet.), and Maxcey v. State, 990 S.W.2d 900, 903-04 (Tex. App.-Houston [14th Dist.] 1999, no pet.), in support of his position that a suspect must fail field sobriety tests in order for an officer to have probable cause to arrest for driving while intoxicated. The State argues that based on the officers' observations at the scene, the officers had probable cause to arrest appellant for intoxication assault or driving while intoxicated. Moreover, the State argues that even if the officers lacked probable cause to arrest appellant for driving while intoxicated, there clearly was probable cause to arrest him for public intoxication.[58] We conclude it is unnecessary to decide if there was probable cause to arrest appellant for driving while intoxicated because there was probable cause to arrest him for public intoxication.

3. Public Intoxication
A person commits the offense of public intoxication if he appears in a public place while intoxicated to the degree that he may endanger himself or another.[59] The test for whether probable cause exists for a public intoxication arrest is whether the officer's knowledge at the time of the arrest would warrant a prudent person in believing that a suspect, albeit intoxicated, was in any way a danger to himself or another person.[60] One of the essential elements to the offense of public intoxication is intoxication "to the extent that he may endanger himself or another."[61] The fact that an accused has been involved in a car accident is sufficient probable cause to believe that he poses a danger to himself or others.[62] If the officers had probable *446 cause to arrest appellant for any offense committed in their presence, then a warrant was unnecessary and the arrest was proper.[63]
Here, Officer Cano testified that when he first approached appellant at the scene, appellant was "standing right by the truck just south of the van" involved in the accident. Appellant testified that when he heard the impact, he parked the van and exited the vehicle. According to Cano, appellant "right away came up and told me that he thought he had hit a dog." Thus, appellant was in a public place.[64] Based on the officers' observations that appellant smelled of alcohol and was staggering, we conclude there was probable cause to arrest appellant for public intoxication.[65] Accordingly, we conclude appellant's arrest on the basis of public intoxication was lawful, and evidence obtained as a result of his lawful arrest was not the fruit of an illegal arrest.[66]

D. Admissibility of Post-arrest Evidence
Although we have concluded that appellant's arrest was lawful, we turn to his argument that evidence resulting from his arrest, including the videotape, events at the police station, and any refusal to submit to a breath test at the station, should have been suppressed because he was not given the post-arrest warnings required by Miranda.[67] Appellant contends that the evidence obtained pursuant to his "unlawful" arrest "should have been excluded as fruits of the poisonous tree"[68] pursuant to the Fourth Amendment to the United States Constitution[69] and article 38.23 of the Texas Code of Criminal Procedure.[70]
*447 In his fifth issue, appellant contends the trial court erred in admitting the videotape of his conversation with Officer Garcia[71] while appellant was transported to the police station.

1. Applicable Law
Miranda holds that when a criminal suspect is placed in custody, law enforcement personnel must comply with certain procedural safeguards in order to protect the suspect's privilege against compulsory self-incrimination under the Fifth Amendment.[72]Miranda and its progeny hold inadmissible incriminating statements made by the accused if the authorities have not given the requisite warnings and the accused has not waived these rights.[73]
However, Miranda's safeguards apply only when a suspect is placed in custody and interrogated by police.[74] Custodial interrogation for purposes of Miranda includes both express questioning, and also words or actions that, given the officers' knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to "have ... the force of a question on the accused," and therefore are reasonably likely to elicit an incriminating response.[75] The latter part of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.[76]
Not all post-arrest police questioning can be classified as interrogation.[77] Statements given freely and voluntarily are admissible in evidence.[78] In distinguishing situations which require safeguards to protect the privilege against self-incrimination from those that do not, the Miranda court pointed to isolation and intimidation as key aspects of an interrogation that undermine an individual's ability to speak voluntarily.[79] When an accused in custody spontaneously volunteers information that is not in response to earlier interrogation by authorities, the statement is admissible even though not recorded because it is not the product of custodial interrogation.[80]
Article 38.22 of the Texas Code of Criminal Procedure codifies both Miranda's system of protecting a suspect against self-incrimination and its distinction between voluntary statements and compelled confessions.[81] Article 38.22 prohibits the admission of a written or oral statement made as a result of custodial interrogation by an accused in a criminal *448 proceeding without the warnings required by Miranda.[82] However, section five of article 38.22 states that nothing in the article precludes the admission of a statement that is either (1) res gestae of the arrest or offense, (2) a statement that does not stem from custodial interrogation, or (3) a voluntary statement, whether or not the result of custodial interrogation.[83] If statements are not made as a result of custodial interrogation, the requirements of Miranda and article 38.22 do not apply.[84] Thus, if appellant's statements were not the result of custodial interrogation, they are admissible.[85]
With these principles in mind, we turn to whether the videotape containing appellant's conversation with Officer Garcia was admissible under Miranda and article 38.22.[86]

2. Analysis
At the suppression hearing, Officer Garcia testified as follows:
A [Garcia]: When I got in the unit, when I was backing up, he said, Is the lady okay? And then I said, she's fine. Everything is going to be fine. Don't worry. And then he said in Spanish that the  that it was a dog. Then he said, so he didn't have the lights on. And I was just telling him, Don't worry. Don't worry when I was just taking him over there, and that's basically all that he said and I just told him that everything was going to be fine.
. . . .
A [Garcia]: That happened at the beginning. We were basically heading towards the  when we were arriving at the police department, he [appellant] asked me if he smelled like alcohol, which I replied not to me.
Q [State]: And other than asking you if his breath smelled like beer, a mention of about a dog and about not having the lights on, do you recall if there were any other statements the defendant made to you?
A: No, sir, that's basically it from the beginning all the way to the department.
. . . .
Q [State]: Isn't it true that he [appellant] said, I thought it was a dog not that it was a dog?
A: (Spanish spoken). I thought.
Q: Which translates, I thought it was a dog?
A: Exactly, yes.
. . . .
Q: But you did [ask appellant questions]?
A: Not that I recall. I didn't ask him questions. He was just asking me and I was replying.
Q: Well, it's true, isn't it, that, you know, you did tell him in there, for instance, well, you know, there's people saying that the lights were on?
A: Yes.

*449 Q: Okay. So you did ask him a question at least one question?
A: No. Hethat wasn't a question. He asked me, he said that thethey didn't have the lights on. And I said, Well, there are people saying that the lights were on.
Q: And he answered you?
A: I don't remember if he answered me, though that's the way it happened.
At trial, Garcia testified similarly regarding the conversation with appellant.
Q [State]: And approximately how long did it take for you to transport the Defendant from the scene of the accident to the police department, sir, more or less?
A [Garcia]: A minute and a half, I guess.
Q: And while you were there in the police unit with the Defendant, sir, did the Defendant ever say anything to you?
A: He said a couple of things, yes.
Q: What exactly did the Defendant say to you, sir?
A: He told mehe was saying that it didn't have the lights on, and then he said it hadhe thought he had hit a dog. And, also, when we were getting to the police department, he stated if hein Spanish, he said, "No welo a bironga," if I smell likehe smelled like alcohol or beer.
Q: And that's whatthat's your interpretation of what that means in English?
A: Yes, sir.
Q: And did he sayother than it didn't have the lights on, thought that he hit a dog, and asking you in Spanish if his breath smelt [sic] like alcohol, was there any other statement that you can recall?
[Defense counsel]: Your Honor, I'm going to object to the interpretation. I believe he said, "No welo a bironga," which I believe interprets to "Do I smell like beer," not alcohol, Your Honor.
[State]: I'll rephrase that, Your Honor.
[Court]: All right.
Q [State]: Other than saying to you something about it didn't have the lights on, thought that he hit a dog, and does my breath smell like beer, sir, were there any other statements that you can recall the Defendant making?
A: I can't recall the other ones, sir.
. . . .
[The videotape was played for the jury].
Q [State]: Did you hear what the Defendant said in that portion of the tape, sir?
A [Garcia]: "Yo no vi que venia."
Q: "Yo"excuse me?
A: "Yo no vi que venia."
Q: In Spanish?
A: Yes. That's saying that "I didn't see it coming."
(Portion of videotape played)
[Court]: Did you hear what was said right there?
[Garcia]: "Venia con las pinche luces apagadas."
Q [State]: And what does that mean, sir?
A: He wasthat it was coming with its lights off.
(Portion of videotape played)
Q: Did you hear what was said right there?
A: "Eh, buey, no welo a bironga."
Q: And what does that mean, sir?
A: If he smells like beer.
. . . .
Q [State]: Are there any other statements that you recall the Defendant making, if any, other than what appeared on the videotape and what's been testified to?

*450 A: No, sir.
On these facts, we conclude that although appellant made these statements while in custody, the statements did not result from custodial interrogation for purposes of Miranda and article 38.22. The record shows that appellant made the statements voluntarily and that the statements are therefore admissible.[87] We overrule appellant's fifth issue.
Appellant also argues that admission of the videotape was harmful because in closing arguments, the State emphasized that appellant's speech on the videotape was "slurred." This argument is without merit. In Pennsylvania v. Muniz, 496 U.S. 582, 584, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), a case with facts similar to those in the present case, the United States Supreme Court considered whether various incriminating statements of a drunk-driving suspect, made while performing a series of sobriety tests, constituted testimonial responses to custodial interrogation for purposes of the Fifth Amendment's protection against self-incrimination.[88] The court held that the slurring of speech and other evidence of lack of muscular coordination constituted nontestimonial components of the defendant's responses to questions and therefore were not "testimonial" responses for purposes of the privilege against self-incrimination.[89]
We next address appellant's argument that evidence of his refusal to submit to a breath test at the police station should have been suppressed.
In Muniz, after failing to satisfactorily perform on a series of sobriety tests, the defendant refused the officer's request to submit to a breathalyzer test.[90] The Muniz court noted:
Muniz does not and cannot challenge the introduction into evidence of his refusal to submit to the breathalyzer test. In South Dakota v. Neville, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), we held that since submission to a blood test could itself be compelled, see Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), a State's decision to permit a suspect to refuse to take the test but then to comment upon that refusal at trial did not "compel" the suspect to incriminate himself and hence did not violate the privilege. Neville, supra, at 562-564 [103 S.Ct. 916]. We see no reason to distinguish between chemical blood tests and breathalyzer tests for these purposes. Cf. Schmerber, supra, at 765-766, n. 9 [86 S.Ct. 1826].[91]
Thus, we conclude that the trial court did not err in admitting evidence of appellant's refusal to submit to a breathalyzer test at the police station.[92]
The trial court did not err in denying appellant's motion to suppress evidence resulting from the arrest, including the videotape, the events at the police station, and any refusal to submit to a breath test *451 at the police station. We overrule appellant's third and fourth issues.

E. Post-release Detention
In his sixth issue, appellant contends that evidence of his refusal to take a "second" breath test[93] at his residence should have been suppressed because his continued detention at his residence, after he had been released pursuant to a determination that he was not intoxicated, was unlawful. We agree that the trial court erred in admitting evidence of appellant's alleged refusal to submit to a breath test at his residence, but find that the error was harmless.

1. Applicable Law
The Texas Court of Criminal Appeals interprets the language from Florida v. Royer,[94] "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop," to mean that once the reason for a stop has been satisfied, police may not "fish" for evidence of other unrelated criminal activity.[95] In Davis,[96] the original stop was for a DWI investigation, but after the officers satisfied themselves that the driver was not intoxicated, they detained the driver and passenger until a drug dog could arrive to sniff the car.[97] "[T]he purpose of the investigative detention was effectuated when the officers determined appellant was not intoxicated."[98]

2. Analysis
Here, the evidence shows that appellant passed three field sobriety tests at the police station and was released. Nonetheless, approximately an hour and forty minutes after the accident, Officer Rodriguez went to appellant's house and obtained appellant's consent to submit to three additional field sobriety tests. Appellant passed all three tests. Thereafter, Officer Rodriguez requested that appellant provide a breath specimen; appellant refused.
We conclude that after appellant passed the field sobriety tests at the police station, the "purpose of the investigative detention was effectuated"[99] and the investigation should have concluded. Accordingly, we hold that the trial court erred in admitting evidence of appellant's alleged refusal to submit to a breath test at his residence.
However, the erroneous admission of evidence is non-constitutional error.[100] We must disregard non-constitutional error if, after examining the record as a whole, we have fair assurance that the *452 error did not influence the jury or had but a slight effect.[101] In making this determination, the question is not simply whether there was sufficient evidence to support the verdict.[102] Instead, the reviewing court should consider the entire record, including testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire, if applicable.[103] Important factors include the nature of evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case.[104] We should also consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert.[105]
The disputed issue concerned whether appellant was intoxicated at the time of the accident. The evidence elicited regarding officer Rodriguez's questioning of appellant at his residence was that, approximately an hour and forty minutes after the accident, appellant (1) passed three additional field sobriety tests and (2) refused to submit to a breath test. The jury also heard testimony that appellant had refused to submit to a breath test at the police station before he was released. We conclude, after examining the record as a whole, that the evidence of appellant's refusal to submit to a breath test at his residence did not influence the jury or had but a slight effect.[106] Accordingly, we hold that error in admitting evidence of appellant's refusal to submit to a breath test at his residence was harmless and must, therefore, be disregarded.[107] We overrule appellant's sixth issue.

F. Alleged Transportation Code Violations
In his seventh issue, appellant contends that evidence of his refusal to submit to a "second" breath test at his residence should have been suppressed because the State argues that he was not under arrest, and section 724.012 of the transportation code[108] only applies to persons under arrest. Appellant also argues the evidence of his refusal should be suppressed because he was not provided the statutorily-required warnings of section 724.015 of the transportation code.[109] Because we have already determined that the trial court erred in admitting evidence of appellant's refusal to submit to a breath test at his residence on different grounds, but that such error was harmless, we need not address appellant's seventh issue.[110]

IV. Admissibility of Evidence
In his eighth issue, appellant contends the trial court erred in excluding two photographs that he offered into evidence. Appellant, who was running for mayor of Elsa during the relevant time period, offered two photographs showing that on *453 election day, appellant's political opponent placed a wheelchair and a Harley Davidson motorcycle at the polling place to remind voters of the accident.
We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard.[111] The test for whether a trial court abused its discretion is whether the action was arbitrary or unreasonable.[112] An appellate court must not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement.[113]
Under Rule 401, evidence is relevant if it makes the existence of a fact that is of consequence to the determination of the action more probable than it would be without the evidence.[114] If the trial court determines the evidence is irrelevant, the evidence is absolutely inadmissible and the trial court has no discretion to admit it.[115] Questions of relevance should be left largely to the trial court and will not be reversed absent an abuse of discretion.[116] To be included in the expansive definition of relevant evidence, proffered evidence must have influence over a consequential fact.[117]
Here, the issue was whether appellant was guilty of intoxication assault. The tactics used by appellant's opponent in the Elsa mayoral run-off election were irrelevant to the issue of appellant's guilt. We conclude the trial court did not abuse its discretion in excluding the photographs. We overrule appellant's eighth issue.

V. Motion for New Trial
In his ninth, tenth, and eleventh issues, appellant contends the trial court erred in denying his motion for new trial.
A trial court's ruling denying a defendant's motion for new trial is reviewed under an abuse of discretion standard.[118] Under this standard, we must "afford almost total deference" to the trial court's determination of the historical facts and of mixed questions of law and fact that turn upon an evaluation of credibility and demeanor.[119] We review questions of law, as well as mixed questions of law and fact that do not turn upon an evaluation of credibility and demeanor, de novo.[120]
An abuse of discretion occurs when the trial court's decision is arbitrary or unreasonable.[121] A trial court's decision to deny a motion for new trial will be sustained if it is correct on any theory of law applicable to the case.[122]

*454 A. Alleged Brady Violation[123]
In his ninth issue, appellant argues the trial court erred in denying his motion for new trial because the State failed to disclose evidence favorable to his defense. Specifically, appellant complains the State failed to disclose testimony by Officer Patricia Decanini that J.P. Rodriguez tore up Officer De Hoyos's original report, which was signed by Officer Garcia, stating that appellant passed the field sobriety tests. Appellant argues that "there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different since defense counsel could have nullified the swearing match between Sergeant De Hoyos against officers J.P. Rodriguez and Flavio Garcia." According to appellant, "[t]he defense could have made the showing that Flavio Garcia had in fact agreed that [appellant] passed all the exams and that J.P. Rodriguez knew of that fact and was suppressing it." Decanini's testimony was that Officer J.P. Rodriguez had discarded a written report by De Hoyos, and signed by Officer Garcia, stating that appellant had passed the field sobriety tests. She also testified that J.P. Rodriguez said he was "going to fuck over" appellant. Decanini testified she was never contacted by the State and was never listed as a witness. Decanini testified that she was advised by appellant that she should go and talk to appellant's attorney. Decanini testified that no one from the district attorney's office ever questioned her regarding the information she had; rather, she was "advised" by appellant to see appellant's attorney.
At the hearing on the motion for new trial, appellant's attorney was asked whether there was any information he gathered from Officer Decanini that would have helped in the defense of the case. Appellant's attorney stated that the fact that Decanini typed De Hoyos's original report, which was signed by Flavio Garcia, and that the report was destroyed would have been helpful. At the hearing, it was established, however, that the State did not have the "missing" or "destroyed" report by Officer De Hoyos. Moreover, appellant's counsel admitted that he knew of the "missing" report prior to the commencement of trial. At the conclusion of the hearing on the motion for new trial, the trial court noted that at trial, the issue was "exhausted to no end, almost to the point of having nausea regarding a missing report."
We conclude that Decanini's testimony would simply have impeached Garcia's testimony that he did not recall seeing or signing De Hoyos's report. We conclude appellant has failed to establish that he would have been found not guilty if Decanini had testified at trial. We overrule appellant's ninth issue.

B. "Newly-Discovered" Evidence
In his tenth issue, appellant contends the trial court erred in denying his motion for new trial because of the "newly-discovered" evidence of Decanini's testimony. We have already determined that Decanini's testimony was that J.P. Rodriguez destroyed De Hoyos's original report. We have also already decided that this testimony would not have changed the outcome of the trial. We overrule appellant's tenth issue.

C. Ineffective Assistance
In his eleventh issue, appellant contends his trial counsel was ineffective for failing to discover Decanini's testimony.
*455 Strickland v. Washington,[124] sets forth the standard of review for effectiveness of counsel.[125]Strickland requires a two-part inquiry.[126] The defendant must first show that counsel's performance was deficient, in that it fell below an objective standard of reasonableness.[127] Second, the defendant must prove there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[128] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[129]
The determination regarding whether a defendant received effective assistance of counsel must be made according to the facts of each case.[130] An appellate court looks to the totality of the representation and the particular circumstances of the case in evaluating counsel's effectiveness.[131]
The appellant bears the burden of proving by a preponderance of the evidence that counsel was ineffective.[132] There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.[133] To defeat the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness."[134] Generally, the record on direct appeal will be insufficient to show that counsel's representation was so deficient as to meet the first part of the Strickland standard.[135]
Here, we have already determined that Decanini's testimony that there was an original report would not have altered the outcome of the trial. Accordingly, appellant has failed to establish the second prong of Strickland. We overrule appellant's eleventh issue.

VI. Dissenting Opinion
We next turn to the arguments raised in the dissenting opinion.
Although the dissent agrees that there was probable cause to arrest appellant and that he was arrested at the scene of the accident, it argues that because he was not read Miranda[136] warnings, his arrest was "unlawful" and all evidence related to the "unlawful" arrest (including statements he made to the police and any refusals to take a breath test) "should have been excluded as fruits of the poisonous tree." In support of this position, the dissent cites Sossamon v. State, 816 S.W.2d 340, 346 (Tex. Crim.App.1991), Corbin v. State, 91 S.W.3d 383, 385 (Tex.App.-Texarkana 2002, pet. denied), and article 38.23 of the code of criminal procedure.[137] We conclude that *456 the dissent's reliance on these authorities is misplaced.
In Sossamon, the police had obtained an involuntary confession and the identity of a witness from the defendant by making false promises of immunity.[138] The court found an otherwise valid in-court identification of the defendant inadmissible because the identifying witness was located solely through the defendant's involuntary confession.[139] Thus, the court held that the witness's presence in the courtroom, which led to the identification of the defendant, should have been suppressed pursuant to the defendant's Fifth Amendment right against self-incrimination.[140]
Likewise, in Corbin, the court found the defendant's written statement (admitting possession of cocaine) inadmissible as "fruit of the poisonous tree" because it was taken after the drugs were discovered pursuant to an illegal stop.[141] In both cases, evidence was held inadmissible because it was obtained as a result of illegal police conduct.
The dissent also argues that the admission of appellant's statements while being transported to the station and at the station violated article 38.23.[142] However, in Baker v. State, the court of criminal appeals has held that "mere violations of the Miranda rule are not covered by the state exclusionary rule contained in article 38.23."[143] Thus, article 38.23 does not bar the admission of appellant's statements en route to the station or at the station.
The United States Supreme Court has recently held that the "fruit of the poisonous tree" doctrine does not apply to a mere failure to provide Miranda warnings to a suspect before custodial interrogation when the suspect makes a voluntary statement.[144] "Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made."[145] The presumption, or "taint," that an unwarned confession was involuntary does not attach to subsequent statements obtained after a suspect voluntarily and knowingly waives his or her Miranda rights.[146]
The Texas Court of Criminal Appeals has similarly held that the "fruit of the poisonous tree" doctrine does not apply to mere violations of the prophylactic requirements in Miranda:[147] The doctrine *457 "requires suppressing the fruits of a defendant's statement only when the statement was obtained through actual coercion."[148]
For these reasons, we disagree with the conclusions reached in the dissenting opinion.

CONCLUSION
We AFFIRM the trial court's judgment.
Concurring opinion by Justice CASTILLO.
Dissenting opinion by Chief Justice VALDEZ joined by Justice RODRIGUEZ.
Concurring Opinion by Justice CASTILLO.
Respectfully, for the reasons that follow, I concur with the result. Appellant Rafael Javier Rodriguez's vehicle struck a motorcycle on a public roadway. A jury found him guilty of intoxication assault,[1] assessed a sentence at six years in the Texas Department of Criminal JusticeInstitutional Division, and imposed a $10,000 fine.[2] Rodriguez presents eleven issues for review.[3] I address these seriatum, and affirm.

I. SUFFICIENCY OF THE EVIDENCE
In his first and second issues, Rodriguez argues that the evidence is legally and factually insufficient to prove either (1) intoxication, or (2) that the accident was caused by reason of that intoxication. The State counters that the evidence sufficiently establishes that (1) while intoxicated and by reason of that intoxication, (2) Rodriguez caused his vehicle to collide with the victim's motorcycle, and (3) the victim sustained serious bodily injury.

A. Standard of Review
A legal sufficiency challenge calls on us to review the relevant evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Escamilla v. State, 143 S.W.3d 814, 817 (Tex.Crim.App.2004). In determining the factual sufficiency of the elements of the offense, we view all the evidence neutrally, not through the prism of "the light most favorable to the prosecution." Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex.Crim.App.2004). However, we approach a factual-sufficiency review with appropriate deference, to avoid substituting our judgment for that of the fact finder. Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App.2000) (en banc). The sufficiency of the evidence is measured against the elements of the offense as defined by a hypothetically correct jury charge for the case. See Malik v. State, 953 S.W.2d 234, 240 (Tex.Crim.App.1997); Adi v. State, 94 *458 S.W.3d 124, 131 (Tex.App.-Corpus Christi 2002, pet. ref'd). The conviction will be upheld if the evidence is sufficient to support a finding of guilt under any one of the theories submitted. TEX.CODE CRIM. PROC. ANN. art. 37.07, § 1(a) (Vernon Supp.2004-05) (verdict must be general); Kitchens v. State, 823 S.W.2d 256, 258 (Tex.Crim.App. 1991) (en banc).

B. The Elements of Intoxication Assault
The hypothetically correct jury charge in this case would ask the jury if Rodriguez: (1) by accident or mistake, (2) while operating a motor vehicle, (3) in a public place, (4) while intoxicated, (5) by reason of that intoxication, (6) caused serious bodily injury to another. See TEX. PEN.CODE ANN. § 49.07(a)(1) (Vernon 2003). "Intoxicated" means not having the normal use of mental or physical faculties by reason of the introduction of alcohol, or having an alcohol concentration of 0.08 or more. See TEX. PEN.CODE ANN. § 49.01(2)(A), (B) (Vernon 2003). A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient. TEX. PEN. CODE ANN. § 6.04(a) (Vernon 2003).
Rodriguez's argument on appeal focuses on the elements of intoxication and causation by reason of intoxication. I turn to the record evidence.

C. Legal Sufficiency Analysis
At approximately 9:30 p.m. on November 8, 2001, Rodriguez drove his van on Magnolia Street where the street intersects with FM 88, a public road with one lane of travel going either direction. Espiridion Jackson followed him in a separate vehicle. Meanwhile, Linda Perez, a motorcycle-safety instructor, drove her motorcycle on FM 88 toward the Magnolia Street intersection.[4] Traveling at approximately 35 miles per hour, she saw two headlights in her lane traveling toward her. Perez reduced her speed to 25 miles per hour, assuming that the driver was in the wrong lane to negotiate a turn somewhere in front of her. The vehicle continued its approach in the wrong lane. She maneuvered her motorcycle to the far left of her lane and saw another set of headlights directly behind the van approaching her, also in the wrong lane. With little time to spare and aware that the first vehicle was not going to move out of her lane, but concerned that the second vehicle might move to its proper lane, Perez decided to "go to the ditch, the curb instead of to the other lane because of the vehicle behind the van." At that instant, the van was upon her. The driver made no attempt to avoid the collision. The van did not stop before the impact, which occurred in her lane. Perez recalled that she was on the ground pinned underneath the van, in and out of consciousness, and in pain.
The first officer on the scene, Jaime Cano, testified that the motorcycle landed ten to fifteen feet from the point of impact. The van stopped approximately eighty feet from the motorcycle. Photographs of the van admitted in evidence show damage to the front of the van on the driver's side, consistent with a head-on impact. Inside the van in plain view, Cano saw an open 24-ounce container of beer on the left side of the front-seat console. The open container showed condensation and appeared to be full. Through the open side door of the van, also in plain view, Cano saw three *459 unopened 24-ounce cans of beer on the floorboard behind the driver's seat.[5] Persons at the scene directed Cano to Rodriguez as the driver of the van. Cano told Rodriguez to follow him to the police unit to talk. While walking toward the unit, Cano "smelled the strong odor of alcohol" when Rodriguez spoke. Rodriguez told him he thought he hit a dog. Cano noticed Rodriguez "was staggering as we were walking to the unit . . . to the point where he had to hold on to [Cano's shoulder] to keep from falling down." Rodriguez also told him that "the lights were off." Because Rodriguez was trembling, staggering and Cano could smell alcohol, Cano told him to sit down on the front seat of the unit for Rodriguez's personal safety. Rodriguez complied. Meanwhile, a video camera that Cano personally installed in the police unit was operating.[6] Cano returned to the impact scene to continue his investigation of the scene.
Officer Garcia testified his supervisor instructed him to transport Rodriguez to the police department. Garcia was not aware that the videotape was operating while he transported Rodriguez in Cano's unit. On the way, Rodriguez told Garcia the motorcycle did not have its lights on and he thought he hit a dog. Admitted in evidence, the videotape reflects Rodriguez asked Garcia if he smelled like beer. Garcia responded he did not smell anything. The videotape reflects Rodriguez stated, "I didn't see it coming ... It was coming with its light off . . . Do I smell like beer?" Garcia testified that, in his opinion, Rodriguez did not have the normal use of his mental and physical faculties at the time.
Officer Juan Rodriguez[7] testified that the van traveled approximately seventy-nine feet from the point of impact. A strong odor of an alcoholic beverage emanated from inside the van. The first time he contacted Rodriguez was at a residence about an hour and twenty minutes after the accident. Rodriguez told the officer he drank "three to four beers." The officer noticed Rodriguez's speech was slurred. Officer Rodriguez testified he was ordered not to arrest Rodriguez.
Appellant Rodriguez testified that he drank less than one beer that evening because of an upset stomach. He was with E. Jackson and two other men who drank beer in various amounts. He denied that he was intoxicated at the time of the collision. He stated that the beer in the front seat belonged to E. Jackson, who exited the van to drive his own vehicle to Rodriguez's house. Rodriguez testified that the beers in a bag in the back of the van belonged to an employee of his construction company. Rodriguez admitted he asked the transporting officer whether he smelled like beer. He explained that after exiting the unit at the police department, he told the officer that he had spilled beer on his right sleeve. Rodriguez denied that his speech was slurred. He denied he staggered, explaining that, while walking toward the police unit with Cano, he stepped over a cable and felt pain in his back. He testified he did not know whether he had alcohol on his breath because, "I didn't smell it." Finally, Rodriguez denied that his speech on the videotape was slurred.
*460 Regarding the collision, Rodriguez testified that on the way to his nearby home, he stopped at the stop sign on Magnolia Street and waited for a vehicle to pass. He then proceeded through the intersection, making a "left turn and felt something hit the van." "The hit was hard," he stated. He did not see the motorcycle before impact. During cross-examination, Rodriguez testified he thought he hit a dog because "It didn't seem like an accident... It didn't seem like an impact, a big impact. I didn't see any lights." He admitted he did not see a dog on the roadway before the impact. Immediately after the collision, Rodriguez walked to his residence to look for a jack stand so that he could lift the van and remove Perez, but he did not find the tool.
Perez, the victim, testified that turning the ignition on her motorcycle automatically turns on the headlights. She testified that two driving lights mounted on the engine guard of her motorcycle also turn on automatically. Her lights were on as she traveled on FM 88.
Viewed in the light most favorable to the verdict, evidence of the "loss of faculties" definition of intoxication in the record includes: (1) Rodriguez's slurred speech; (2) staggering to the point of holding on to an officer's shoulder; (3) the smell of alcohol on his breath; (4) his statement to an officer that he drank "three to four" beers; (5) driving in the wrong lane of a public road; (6) lack of awareness that a vehicle was approaching head-on; (7) after a head-on collision with a motorcycle, traveling an additional seventy-nine feet while dragging a person underneath; (8) admitting that he never saw the headlights; (9) admitting that he never saw the motorcycle even upon impact; and (10) officer Garcia's opinion that Rodriguez did not have the normal use of his mental and physical faculties.[8] I conclude that a rational trier of fact could reasonably find beyond a reasonable doubt that Rodriguez did not have the normal use of his mental of physical faculties by reason of the introduction of alcohol. See TEX. PEN.CODE ANN. § 49.01(A) (Vernon 2003).
Viewed in the light most favorable to the verdict, evidence that the accident was caused by reason of intoxication includes the same evidence to support he was intoxicated and: (1) the accident occurred within walking distance of Rodriguez's residence, from which the jury could infer it occurred on a roadway familiar to him; (2) beginning at approximately 6:00 p.m. until the time of the accident, Rodriguez was with three individuals who drank beer in various amounts while they were together; and (3) the photographs admitted in evidence showed damage to the van directly in front of the driver (as compared with Rodriguez's testimony that he never saw the motorcycle). The jury could reasonably conclude that Rodriguez was driving his personal van on a familiar road. The jury could reasonably infer that, by reason of intoxication, Rodriguez caused serious bodily injury to Perez after a head-on collision in which Rodriguez was the errant driver on a familiar road. See TEX. PEN. CODE ANN. § 6.04 (Vernon 2003); see also Sanders v. State, 119 S.W.3d 818, 821 (Tex. Crim.App.2003) (a rational jury could have inferred an ultimate fact); Evans v. State, 5 S.W.3d 821, 823 (Tex.App.-San Antonio 1999, no pet.) (en banc) (finding evidence legally and factually sufficient to prove loss of faculties definition).
*461 Viewing the evidence in the light most favorable to the verdict, I conclude the evidence is legally sufficient to sustain the elements of intoxication and causation by intoxication and agree to overrule Rodriguez's first issue.

D. Factual Sufficiency Analysis
In his second issue, Rodriguez challenges the same elements of intoxication and causation, arguing additionally that evidence of the elements, if any, is too weak or greatly outweighed by contrary evidence. Rodriguez points to testimony from law enforcement officers that he passed three field sobriety tests and from laymen that he did not drink. The State counters that evidence sufficiently controverted Rodriguez's defensive theory that he was not intoxicated.
Our neutral review of all the evidence, both for and against the challenged elements, looks to determine whether proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or whether proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. See Zuniga, 144 S.W.3d at 484-85; see also Zuliani v. State, 97 S.W.3d 589, 593-94 (Tex.Crim.App.2003). We remain mindful of the jury's role to resolve conflicts in testimony. See Mosley v. State, 983 S.W.2d 249, 254 (Tex.Crim. App.1998) (en banc) (questions concerning the credibility of witnesses and the weight to be given their testimony are to be resolved by the trier of fact); see also Esquivel v. State, 506 S.W.2d 613, 615 (Tex. Crim.App.1974). We must assume that the fact finder resolved conflicts, including conflicting inferences, in favor of the verdict, and must defer to that resolution. Matchett v. State, 941 S.W.2d 922, 936 (Tex.Crim.App.1996) (en banc). With these principles in mind, I turn to the evidence.
Evidence against the finding of the element of intoxication includes testimony that Rodriguez passed three field sobriety tests conducted by officer De Hoyos at the police station.[9] The tests were witnessed by Garcia, who transported Rodriguez to the station. While De Hoyos was "booking" Rodriguez, the police chief Primitivo Rodriguez arrived, asked if Rodriguez passed the tests, and then requested that a test be performed in his presence. This was done, and Rodriguez passed the one-leg balance test. According to the police chief, Rodriguez lifted his foot and did not stagger. The police chief then ordered Rodriguez released because, based on his experience, he was "not intoxicated." However, officer Garcia testified that, in his opinion, Rodriguez did not actually pass the test because he used a nearby file cabinet for support, contrary to normal testing procedure.
When officer Juan Rodriguez arrived at the police station, he learned that Rodriguez had been released. Officer Rodriguez testified he was the sole officer in the department certified to perform field sobriety tests. When he questioned that the tests were performed by uncertified personnel, the police chief told him to contact Rodriguez and re-test him. Approximately "one hour and forty to fifty minutes" after the collision, officer Rodriguez administered three field sobriety tests on Rodriguez at a residence.[10] Rodriguez passed all three.
*462 Evidence reflected that, at various times between 6:00 p.m. and 9:30 p.m. (the time of the collision), Rodriguez was in the company of E. Jackson, Jackson's brother Andres, and Javier Guerrero. Rodriguez admitted to drinking only one beer, which he obtained at Andres's residence. Andres had begun drinking earlier, and continued to drink while in the van. The four traveled to a barbecue, where, according to Rodriguez, the host and the host's two friends were intoxicated. Both the Jackson brothers testified that they did not see Rodriguez drink that evening and that he was not intoxicated. When asked to clarify grand jury testimony that he saw Rodriguez consume alcohol in the van, E. Jackson explained, "[I]t's not what I meant to say. . . . I didn't see him consume alcohol." Jackson also testified that the beer in the front seat of the van belonged to him.
Based on its resolution of historical facts and credibility determinations, the jury implicitly rejected evidence favorable to Rodriguez, including evidence that he did not consume an intoxicating beverage and was not intoxicated. The jury, as fact-finder, could have disbelieved all the witnesses or any of them, and was free to reject their testimony. Mosley, 983 S.W.2d at 254; Esquivel, 506 S.W.2d at 615. Additionally, the jury could have reasonably inferred that De Hoyos's field sobriety tests were unreliable because he was not certified and because of testimony that Rodriguez used a file cabinet for support. Similarly, the jury could have reasonably inferred that the final field sobriety test, conducted at least an hour and twenty minutes after the collision, was too remote in time to be reliable. Finally, the jury could have reasonably concluded that evidence of Rodriguez's intoxication, taken together with evidence of his operation of a motor vehicle on the wrong lane on a familiar roadway toward an oncoming motorcycle that he never saw, outweighed evidence that he passed the field sobriety tests. See TEX. PEN.CODE ANN. §§ 49.01(A), 49.07(a)(1) (Vernon 2003); see also Evans, 5 S.W.3d at 823. The same evidence allowed the jury to reasonably infer that, by reason of that intoxication, Rodriguez caused Perez serious bodily injury. See TEX. PEN.CODE ANN. §§ 6.04, 49.07(b) (Vernon 2003).[11]
Because we must assume that the jury resolved conflicts, including conflicting inferences, in favor of the verdict, I defer to that resolution. Mosley, 983 S.W.2d at 254. Thus, viewing the evidence in a neutral light, I conclude that evidence supporting the elements of intoxication and causation by intoxication is not too weak to support the jury's finding beyond a reasonable doubt; nor is the weight of the contrary evidence strong enough that the State could not have met its burden of proof. Zuniga, 144 S.W.3d at 484-85. Thus, the evidence is factually sufficient to sustain the elements of intoxication and causation by intoxication. I agree with the majority decision to overrule Rodriguez's second issue.

II. MOTION TO SUPPRESS
By his third through seventh issues, Rodriguez argues the trial court erred in denying his motion to suppress[12] based *463 upon (a) unlawful arrest (third issue), (b) unlawful detention (fourth issue), (3) noncompliance with statutory warnings in article 38.22 (fifth issue),[13] (4) unlawful detention (sixth issue), and (5) noncompliance with the transportation code (seventh issue). Rodriguez asserts that, under article 38.23, the trial court must suppress the evidence.[14] The State counters that the trial court properly denied the motion on each of the grounds presented.

A. Standard of Review
A trial court's ruling on a motion to suppress is generally reviewed for abuse of discretion. TEX.CODE CRIM. PROC. ANN. art. 28.01(1),(6) (Vernon 1989); Oles v. State, 993 S.W.2d 103, 106 (Tex.Crim.App.1999); Maddox v. State, 682 S.W.2d 563, 564 (Tex. Crim.App.1985) (en banc); Ford v. State, 26 S.W.3d 669, 672 (Tex.App.-Corpus Christi 2000, no pet.). We review a trial court's ruling on a motion to suppress under the bifurcated standard enunciated in Guzman v. State, 955 S.W.2d 85, 87-88 (Tex.Crim.App.1997). At a suppression hearing, the trial court is the sole finder of fact. Arnold v. State, 873 S.W.2d 27, 34 (Tex.Crim.App.1993). The trial court is free to believe or disbelieve any or all of the evidence presented. Romero v. State, 800 S.W.2d 539, 543 (Tex.Crim.App.1990) (en banc); see Johnson v. State, 803 S.W.2d 272, 287 (Tex.Crim.App.1990) (en banc). Thus, in reviewing a trial court's ruling on a motion to suppress, we give almost total deference to the trial court's determination of historical facts and application-of-law-to-fact questions that turn on credibility and demeanor. Perales v. State, 117 S.W.3d 434, 437 (Tex.App.-Corpus Christi 2003, no pet.); Morrison v. State, 71 S.W.3d 821, 827 (Tex.App.-Corpus Christi 2002, no pet.). We review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. Morrison, 71 S.W.3d at 827. In the absence of explicit fact findings, we assume that the trial court's ruling is based on implicit fact findings supported in the record. Perales, 117 S.W.3d at 437; see Carmouche v. State, 10 S.W.3d 323, 332 (Tex.Crim.App.2000) (recognizing implicit fact findings). We then review de novo whether the facts, express or implied, are sufficient to provide legal justification for admitting the complained-of evidence. See Morrison, 71 S.W.3d at 827 (citing Garcia v. State, 43 S.W.3d 527, 530 (Tex.Crim. App.2001)).
In determining whether a trial court's decision is supported by the record, we ordinarily consider only evidence adduced at the suppression hearing. See Rachal v. State, 917 S.W.2d 799, 809 (Tex.Crim.App. 1996) (en banc). However, this general rule is inapplicable where, as in this case, the suppression issue has been consensually re-litigated by the parties during trial on the merits.[15]Id. Where the State raises the issue at trial, either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the *464 evidence, and consideration of the relevant trial testimony is appropriate in our review. Id. Moreover, it would be unreasonable to ignore trial evidence in our review of the trial court's suppression decision, only to be confronted by the evidence in our consideration of whether the error was harmless. See TEX.R.APP. P. 44.2; Rachal, 917 S.W.2d at 809.
We uphold a trial court's ruling on a suppression motion if it is reasonably supported by the record and is correct on any theory of law applicable to the case. Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim.App.1996 (en banc)); Perales, 117 S.W.3d at 438. This is true even if the decision is correct for reasons different from those espoused by the trial court. Romero, 800 S.W.2d at 543. On the other hand, if the issue is whether an officer had probable cause to seize a suspect, under the totality of the circumstances, the trial judge is not in an appreciably better position than the reviewing court to make that determination. Guzman, 955 S.W.2d at 87; see also Loserth v. State, 963 S.W.2d 770, 772 (Tex.Crim.App.1998). Thus, we will review each of Rodriguez's issues concerning the ruling on his motion to suppress based on the ground presented. Because the trial court did not make explicit findings of fact, we will review the evidence in a light most favorable to the trial court's ruling. Maxwell v. State, 73 S.W.3d 278, 281 (Tex.Crim.App.2002) (en banc). We will not disturb any ruling on a motion to suppress that is supported by the record. Gruber v. State, 812 S.W.2d 368, 370-71 (Tex.App.-Corpus Christi 1991, pet. ref'd); see Villarreal, 935 S.W.2d at 138; Perales, 117 S.W.3d at 438.

B. The Evidence
Rodriguez argues that he was illegally detained, illegally arrested, and that evidence gathered in violation of his constitutional right against unreasonable searches and seizures should have been suppressed. By his motion, Rodriguez sought to suppress "the fruits of everything derived from the unlawful arrest and detention which would include the videotape in the police car (State's Exhibit 2), everything that transpired at the police station, and any kind of refusals at the police station and subsequent refusals."
The parties do not dispute that: (1) at the time in question, Rodriguez was a part-time municipal judge and, by virtue of his position, worked with the officers involved in the investigation of the collision, and knew statutory and arrest procedures;[16] (2) concern for his safety was the reason that Cano requested that Rodriguez sit in the front seat of the police unit and that De Hoyos requested that Garcia transport him to the police station;[17] (3) officers Cano, Garcia, J.P. Rodriguez, and De Hoyos testified that they did not arrest Rodriguez; (4) the police chief ordered officer Rodriguez not to arrest him; (5) a search warrant did not issue; (6) en route to the police station, officer Garcia did not question Rodriguez; (7) Rodriguez and officer Garcia were unaware of Cano's personal video camera in the unit or that it was recording; (8) officers did not give Rodriguez Miranda warnings or handcuff him; and (9) sobriety tests were not performed at the scene.
As part of our sufficiency analysis, I have reviewed the evidence adduced at *465 trial. The following is additional evidence adduced at the suppression hearing, viewed in the light most favorable to the trial court's ruling. See Maxwell, 73 S.W.3d at 281.
Appellant Rodriguez testified that the collision occurred "right at the corner of his house," approximately forty feet distant. Officer Cano approached him while Rodriguez stood near his wife and "advised my wife he would have to take me in." When taken to the police department, he did not feel free to leave. Once at the station, he was taken through the entrance used for prisoners and was escorted to a holding room.[18] He was not told he could not leave. Rodriguez testified that after passing the sobriety tests, he was released to the custody of E. Jackson.[19] Based on his judicial duties, Rodriguez was familiar with Miranda warnings. Rodriguez testified that he knew that, when an accused refuses to take a blood or breath test for alcohol, the individual is immediately arrested. Rodriguez denied he was given the statutory warnings or asked to provide either a breath or blood specimen.[20]
E. Jackson testified that, after Rodriguez was released and driven by Jackson to his former residence, officer Rodriguez arrived to perform a field sobriety test. E. Jackson denied that the officer read Rodriguez the statutory DWI warnings or requested a breath or blood test. He admitted that the officer did not state Rodriguez was under arrest.
Officer Rodriguez testified that, when he began reading the statutory warnings, both Rodriguez and E. Jackson interrupted him. He asked Rodriguez three or four times if he would submit to a breathalyzer test and Rodriguez refused. Rodriguez also refused to sign the relevant forms.
Officer Garcia testified that, at the scene of the collision, he looked to his superior De Hoyos for guidance and was instructed to escort Rodriguez to the police department for his safety and for field sobriety tests. De Hoyos testified that he would not have allowed Rodriguez to leave the scene but did not communicate that to him. De Hoyos denied Rodriguez was under arrest. The record shows that the trial court viewed the videotape. Subsequently, the trial court denied the motion to suppress.

C. Fourth Amendment and Article 38.23
In his third and fourth issues, Rodriguez asserts his rights under the Fourth Amendment and article 38.23, claiming an illegal arrest and detention.[21] In his sixth *466 issue, he argues that the trial court should have suppressed the alleged breath-test refusal because of the illegal arrest and detention. The State counters that Rodriguez was not unlawfully detained or arrested and, thus, the trial court did not err in denying the motion to suppress.

D. Detention Claim
An accused seeking to suppress evidence on the basis of illegal police conduct bears the burden of proof to rebut a presumption of proper police conduct. Moreno v. State, 124 S.W.3d 339, 344 (Tex.App.-Corpus Christi 2003, no pet.) (citing McGee v. State, 105 S.W.3d 609, 613 (Tex.Crim.App. 2003)). A law enforcement officer may conduct a brief investigative detention, or "Terry stop," when he has a reasonable suspicion to believe that an individual is involved in criminal activity. Terry v. Ohio, 392 U.S. 1, 30-31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Balentine v. State, 71 S.W.3d 763, 768 (Tex.Crim.App.2002); Carmouche, 10 S.W.3d at 328. Reasonable suspicion exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity. Garcia, 43 S.W.3d at 530; Woods v. State, 956 S.W.2d 33, 35 (Tex.Crim.App.1997) (en banc). The articulated facts that support a temporary detention must be taken as a whole, and the reasonable suspicion formed must be based on the totality of the circumstances. Woods, 956 S.W.2d at 38. Where the initial detention is unlawful, any evidence seized subsequent to such a detention is inadmissible. Gurrola v. State, 877 S.W.2d 300, 302 (Tex.Crim.App. 1994) (en banc). The ultimate standard set forth in the Fourth Amendment is reasonableness. Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).
In this case, officer Cano arrived at the scene of a motor vehicle accident involving Rodriguez as the driver, with the victim trapped underneath Rodriguez's van. He observed the vehicle had dragged the victim a considerable distance before stopping. Cano smelled the strong odor of alcohol on Rodriguez's breath, and he observed Rodriguez stagger such that he held on to Cano at one point. Similarly, sergeant De Hoyos smelled alcohol on Rodriguez's breath. Officer Rodriguez observed in plain view an open beer container on the driver's side console in the car and three closed beer containers behind the driver's seat. Officer Rodriguez also smelled a strong odor of alcohol emanating from the open van. Officer Garcia did not question appellant Rodriguez en route to the police department. The final field sobriety test was performed approximately an hour and twenty minutes after the accident and subsequent to Rodriguez's leaving the police department.[22]
I conclude that the officers had specific articulable facts to support the right to investigate a vehicular accident involving serious bodily injury,[23] and that they were engaged in a community caretaking function, "totally divorced from the detection, investigation, or acquisition of evidence relating *467 to the violation of a criminal statute." See Cady, 413 U.S. at 446, 93 S.Ct. 2523 ("These officers in a rural area were simply reacting to the effect of an accident  one of the recurring practical situations that results from the operation of motor vehicles and with which local police officers must deal every day."); Maxcey v. State, 990 S.W.2d 900, 903 (Tex.App.-Houston [14th Dist.] 1999, no pet.). While engaged in a community caretaking function, the officers observed signs symptomatic of an intoxication offense, including Rodriguez's own condition and the open beer container. See, e.g., TEX. PEN.CODE ANN. § 49.031(a)(1), (b) (Vernon 2003) (a person commits an offense if in knowing possession of an "open container" of an alcoholic beverage in a motor vehicle). I conclude the officers presented specific and articulable facts sufficient to support a reasonable suspicion to detain Rodriguez for further investigation. See Perales, 117 S.W.3d at 439.
De Hoyos testified that field sobriety tests were not performed at the scene because of Rodriguez's public position and the crowd at the scene. Once Rodriguez passed the tests while at the police station, he left. I agree with the State that "the sequence of events is consistent with an investigative detention of a person reasonably suspected of criminal activity to maintain the status quo while obtaining more information." Terry, 392 U.S. at 20-21, 88 S.Ct. 1868. Thus, I conclude the detention was for investigative purposes and justified. Accordingly, I would uphold the trial court's ruling on the suppression motion because the ruling is reasonably supported by the record and is correct on the theory of lawful detention for investigative purposes. See Villarreal, 935 S.W.2d at 138; Perales, 117 S.W.3d at 438. I agree with the majority to overrule Rodriguez's fourth issue.
In his third issue, Rodriguez asserts that the trial court erred in denying his motion to suppress due to unlawful arrest. He asserts he was deprived of his freedom in a significant way and, thus, was arrested without a warrant or probable cause for an arrest. Because I conclude, as a matter of law, that the police conduct in this case is consistent with a lawful detention for purposes of investigation, I do not reach Rodriguez's third issue claiming unlawful arrest. See TEX.R.APP. P. 47.1. Even so, the police conduct is inconsistent with an arrest. See Dowthitt v. State, 931 S.W.2d 244, 254-55 (Tex.Crim.App.1996). Each officer in contact with Rodriguez denied he arrested him. By its ruling, the trial court implicitly rejected Rodriguez's subjective belief that he was arrested. See Perales, 117 S.W.3d at 437. Giving proper deference to the trial court on a question of law that turns on credibility of the witnesses, I would uphold the trial court's ruling. Id. I would overrule Rodriguez's third issue.
In his sixth issue, Rodriguez argues that the detention at the residence subsequent to his release from the police department was unlawful and, thus, the second refusal to take the breath test should have been suppressed. The State counters that no detention occurred at the residence, and, even if it did, officer Rodriguez had reasonable suspicion to detain Rodriguez.
The second refusal occurred after the police chief ordered Rodriguez's release. Evidence shows that the sole basis for the encounter was to confirm that Rodriguez passed a field sobriety test administered by an officer certified in the procedure, officer Rodriguez. Officer Rodriguez testified that by the time he arrived at the accident scene, Rodriguez was no longer there. Similarly, by the time officer Rodriguez arrived at the police department, Rodriguez was gone. Thus, he first contacted Rodriguez at the residence where *468 he went to perform the field sobriety test that only officer Rodriguez was certified to administer. I conclude that, under the totality of the circumstances leading to the encounter, the detention, if any, was in furtherance of the investigative detention and, thus, not unlawful. Perales, 117 S.W.3d at 437. I conclude that justification is supported by specific and articulable facts in the record. Because I conclude that the detention was lawful, I also conclude that the trial court properly denied the motion to suppress Rodriguez's refusal to take the breath tests because they were not products of an illegal detention. See TEX.CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005). I would overrule Rodriguez's sixth issue.

E. Article 38.22 Claim
In his fifth issue, Rodriguez argues that the trial court should have suppressed the videotape because (1) he was unlawfully arrested, and (2) he was not given the statutory admonishments in article 38.22. See TEX.CODE.CRIM. PROC. ANN. art. 38.22 (Vernon 2005). The State counters that Rodriguez was neither in custody nor interrogated.
Article 38.22 provides that no oral statement of an accused made as the result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless he is properly warned. See TEX.CODE CRIM. PROC. ANN. art. 38.22(3)(a)(2) (Vernon 2005); see also Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, article 38.22 does not preclude admission of a statement (1) made by the accused that does not stem from a custodial interrogation, or (2) of a voluntary statement (whether or not the result of custodial interrogation) that has a bearing upon the credibility of the accused as a witness, or (3) of any other statement that may be admissible under law. TEX.CODE CRIM. PROC. ANN. art. 38.22(3)(a)(5) (Vernon 2005). Thus, if either the "custodial" or "interrogation" predicates are not met, then article 38.22 does not apply. Villarreal v. State, 61 S.W.3d 673, 680 (Tex.App.-Corpus Christi 2001, pet. ref'd). Interrogation includes speech or conduct by the police which the police should know is reasonably likely to elicit an incriminating response from the suspect. Id. (citing Rhode Island v. Innis, 446 U.S. 291, 308, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).
Implicit in the trial court's ruling is the conclusion that Rodriguez was not under arrest. The officers did not give Miranda warnings because he was not under arrest, and, uniformly and while not acting together, their actions are consistent with no arrest. Although officer Garcia did not warn Rodriguez while the video camera recorded his statements en route to the police station, Garcia testified Rodriguez was not under arrest and the statements were recorded by equipment that officer Garcia did not know was operating. By his motion, Rodriguez sought to suppress the videotape.
I have viewed the videotape. Officer Garcia did not question Rodriguez or engage in conduct reasonably likely to elicit an incriminating response from the suspect. Id. Rather, Rodriguez spoke, unprompted by the officer. I conclude that Rodriguez's statements were not made in response to any interrogation. See id. Since Rodriguez's statements were not the product of custodial interrogation, the admission of the statements in evidence is not precluded by article 38.22(5). See TEX. CODE CRIM. PROC. ANN. art. 38.22(5) (Vernon 2005).
I further conclude that the trial court's implicit ruling that Rodriguez was not under arrest is supported by the record and that his videotaped statements were not *469 the result of interrogation. Accordingly, neither the "custodial" nor "interrogation" predicates are met. Thus, article 38.22 does not apply. See Villarreal, 61 S.W.3d at 680. For these reasons, I would overrule Rodriguez's fifth issue.

F. Transportation Code Violation Claim
In his seventh issue, Rodriguez argues that the trial court should have suppressed the breath-test refusal at the residence because officer Rodriguez did not give him the warnings mandated by section 724.015 of the Texas Transportation Code. See TEX. TRANSP. CODE ANN. § 724.015 (Vernon Supp.2004-05).[24] The State counters that Rodriguez was not under arrest when the refusal occurred as required by section 724.015, and his refusal was admissible under section 724.061 of the transportation code.[25] TEX. TRANSP. CODE ANN. § 724.061 (Vernon 1999).
The purpose behind section 724.015 is "to ensure that a person who refuses to give a requested specimen does so with a full understanding of the consequences." Nebes v. State, 743 S.W.2d 729, 730 (Tex. App.-Houston [1st Dist.] 1987, no pet.). Rodriguez testified he was aware of arrest procedures and statutory warnings, and at one point, stated, "On cases like this, you arrest a person if he refuses a breathalyzer, you arrest them right there on the spot." At the motion to suppress hearing, defense counsel argued that the refusal to take the breath test should be suppressed, under Tex. Dep't. of Pub. Safety v. Watson, 945 S.W.2d 262, 266 (Tex.App.-Houston [1st Dist.] 1997, no writ). Watson states, in part, that provisions of the statute apply "postarrest." Id. On appeal, Rodriguez bases his argument on grounds that the statutory warnings are required "if a person is arrested."
I have concluded that Rodriguez was not under arrest when officer Rodriguez contacted him. Officer Rodriguez asked Rodriguez "three or four times" to submit to a breathalyzer test and he refused. Rodriguez also refused to sign the relevant forms. Officer Rodriguez testified that Rodriguez interrupted when he attempted to read the statutory warnings.
Considering the totality of circumstances, I conclude that the trial court's implicit ruling that the transportation code was not violated, on the theory that Rodriguez was not under arrest, is supported by the record. Further, the trial court could have reasonably concluded that, by virtue of his admitted professional experience, Rodriguez had judicial notice of the consequences of the test refusal and, thus, the purpose of section 724.015 was met. See Nebes, 743 S.W.2d at 730. Similarly, the trial court could have reasonably concluded *470 that officer Rodriguez substantially complied with section 724.015 by asking Rodriguez "three or four times" to test and Rodriguez expressly refused, on grounds that Rodriguez, by virtue of his admitted experience, was aware of the consequences of his refusal. Finally, the trial court could have reasonably concluded that the test refusal was relevant evidence admissible under rule 402 of the Texas Rules of Evidence or section 724.061 of the transportation code. See TEX. TRANSP. CODE § 724.061 (Vernon 1999); TEX.R. EVID. 402; Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Crim.App.1990) (en banc) (appellate court should not reverse a trial court's evidentiary ruling that is "within the zone of reasonable disagreement").
Accordingly, I would uphold the trial court's ruling because it is reasonably supported by the record and is correct on various theories of law applicable to the case. Villarreal, 935 S.W.2d at 138. I would overrule Rodriguez's seventh issue.

III. EXCLUSION OF EVIDENCE
In his eighth issue, Rodriguez argues that the trial court abused its discretion by excluding from evidence at trial two photographs he intended to use to demonstrate political pressure to arrest him, a mayoral candidate. The photographs depict a wheelchair and a motorcycle at a polling place.[26] The State counters that the tactics used by Rodriguez's political opponent were not relevant to the determination of guilt.

A. Standard of Review
A trial court's admission or exclusion of evidence is reviewed under an abuse of discretion standard. Torres v. State, 71 S.W.3d 758, 760 (Tex.Crim.App.2002); Salazar v. State, 38 S.W.3d 141, 153-54 (Tex. Crim.App.2001).[27] A trial judge is given wide discretion when deciding admissibility of photographs. Sonnier v. State, 913 S.W.2d 511, 519 (Tex.Crim.App.1995) (en banc). If elements of a photograph are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if its emotional and prejudicial aspects substantially outweigh its helpful aspects. Erazo v. State, 144 S.W.3d 487, 491-92 (Tex.Crim.App.2004).

B. The Evidence
Outside the jury's presence, Rodriguez testified that he defeated the mayoral incumbent and proceeded to a run-off election. He took the two photographs on the run-off election day. The photographs are black and white, and show a wheel chair with a sign on it that states, "[presumably, the opponent's name] helps not ... [illegible]." The trial court ruled the photographs inadmissible on grounds that they were not relevant, pronouncing, in part, "I don't want to politicize this case. What happened that night is going to stay what happened that night."

C. Analysis
A photograph is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable *471 than it would be without the evidence." TEX.R. EVID. 401; see also TEX.R. EVID. 402, 403. I conclude that the photographs contain no elements that would be helpful to the jury in reaching its decision on Rodriguez's culpability. Erazo, 144 S.W.3d at 491-92. I further conclude that the emotional and prejudicial aspects of the photographs substantially outweigh any perceived helpful aspects. Id. Accordingly, the trial court's ruling to exclude the photographs was within the zone of reasonable disagreement. See Montgomery, 810 S.W.2d at 379. Thus, the trial court did not abuse its discretion. Id. I would overrule Rodriguez's eighth issue.

IV. MOTION FOR NEW TRIAL
In his ninth, tenth, and eleventh issues, Rodriguez argues the trial court abused its discretion by denying his motion for new trial because (1) the State failed to disclose a witness, officer Patricia Decanini, who had evidence favorable to the defense; (2) the newly discovered evidence would have resulted in a different outcome; and (3) defense counsel was ineffective by failing to discover officer Decanini's testimony before trial. The State counters that Decanini's testimony was merely collateral or impeaching of other evidence and, thus, Rodriguez did not show a reasonable probability that the result would have been different.

A. Standard of Review  Denial of a Motion for New Trial
In criminal cases, there is no common law right to a new trial. Banks v. State, 79 Tex.Crim. 508, 186 S.W. 840, 841 (1916). The right is purely statutory. Id.; see Drew v. State, 743 S.W.2d 207, 223 (Tex. Crim.App.1987) (en banc); see also TEX. R.APP. P. 21.2. We review the grant or denial of a motion for new trial under an abuse of discretion standard. See Lewis v. State, 911 S.W.2d 1, 7 (Tex.Crim.App.1995) (en banc). We may not substitute our judgment for that of the trial court, Cantu v. State, 842 S.W.2d 667, 682 (Tex.Crim. App.1992) (en banc), and credibility of the witnesses is primarily a determination for the trial court. Hoyos v. State, 951 S.W.2d 503, 511 (Tex.App.-Houston [14th Dist.] 1997), aff'd, 982 S.W.2d 419 (Tex.Crim. App.1998). As finder of fact, the trial court may accept or reject any or all of the testimony given by State or defense witnesses. Johnson v. State, 571 S.W.2d 170, 173 (Tex.Crim.App.1978); see also Guzman, 955 S.W.2d at 89. Thus, we are authorized to: (1) apply a deferential standard of review to the trial court's resolution of historical facts; and (2) may rely upon implied findings of fact that are supported by the record to uphold the trial court's ruling, even when the trial court is not faced with expressly conflicting affidavits or testimony. Charles v. State, 146 S.W.3d 204, 206 (Tex.Crim.App.2004); Villarreal v. State, 79 S.W.3d 806, 811-12 (Tex.App.-Corpus Christi 2002, pet. ref'd).

B. The Brady Claim
In his ninth issue, Rodriguez asserts that the Brady violation requires a new trial. See Brady v. Maryland, 373 U.S. 83, 87-88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he complains the State was required to disclose to him the existence of officer Decanini, who, in essence, would testify that officer Rodriguez (1) destroyed sergeant De Hoyos's police report favorable to Rodriguez, and (2) stated he was going "to get" Rodriguez.

1. The Law
Prosecutors are prohibited from suppressing facts or secreting witnesses who may establish the innocence of the accused. TEX.CODE CRIM. PROC. ANN. art. 2.01 (Vernon 2005). A defendant in a criminal *472 case must be granted a new trial when evidence tending to establish the defendant's innocence has been intentionally withheld, thus preventing its production at trial. TEX.R.APP. P. 21.3(e). A Brady violation occurs if (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to the defendant; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.[28]Ex parte Richardson, 70 S.W.3d 865, 870 (Tex.Crim.App.2002); Thomas v. State, 841 S.W.2d 399, 404 (Tex.Crim.App.1992) (en banc). The prosecution has no duty to turn over evidence not in its possession or not known to exist. State v. Blanco, 953 S.W.2d 799, 802-03 (Tex.App.-Corpus Christi 1997, pet. ref'd) (citing Hafdahl v. State, 805 S.W.2d 396, 399 n. 3 (Tex.Crim. App.1990) (en banc)). Although the prosecution has no duty to turn over evidence not in its possession or not known to exist, the prosecution does have a duty to learn of any favorable evidence known to others acting in the case on the State's behalf, including the police. Blanco, 953 S.W.2d at 802-03 (citing Kyles v. Whitley, 514 U.S. 419, 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).
Our review of a prosecutor's alleged failure to disclose exculpatory evidence requires us to: (1) employ a materiality standard rather than a constitutional harmless-error standard in evaluating the evidence; and (2) determine the materiality of the evidence in light of all other evidence properly introduced at trial. Hampton v. State, 86 S.W.3d 603, 612 (Tex.Crim.App.2002). We consider any adverse effect that the prosecutor's non-disclosure might have had on the preparation or presentation of the accused's case. Thomas, 841 S.W.2d at 405. We assess the possibility that an adverse effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's failure to disclose. Id. To make this determination, we examine the alleged error in the context of the overall strength of the State's case. Id.

2. The Evidence
Rodriguez timely filed an amended motion for new trial asserting, in part, a Brady violation and newly discovered evidence.[29] The trial court convened an evidentiary hearing.
*473 Officer Patricia Decanini testified that, post trial, Rodriguez contacted her about a missing report, which was compiled by sergeant De Hoyos, signed by officer Garcia, and showed Rodriguez passed the sobriety test.[30] Because she recalled the report, she compiled the motion for new trial affidavit, which was admitted in evidence. Decanini testified that De Hoyos gave her a handwritten report and she offered to type it for him to make it "professional."[31] The report indicated that Rodriguez had passed the field sobriety test. Decanini testified that the handwritten report was signed by officer Garcia, indicating that he concurred with the opinions in the report. On cross-examination, she conceded the handwritten report did not have language stating that Garcia concurred with the report, and that, because of his superior rank, and because it was not common practice in the police department, De Hoyos did not need Garcia's signature or approval. After Decanini finished typing the report, she gave it to De Hoyos and he signed it. She gave the report to officer Rodriguez, who made a derogatory comment about De Hoyos and threw the report away. Decanini further testified that officer Rodriguez "always had a grudge against" Rodriguez. Officer Rodriguez told her that he had worked the case, had a good case, and was going to "[expletive] over the judge." Decanini admitted that none of the police reports generated by any officer included her name. She also admitted she was not involved in the motor vehicle accident investigation.
Rodriguez's lead counsel at trial testified that co-counsel filed a Brady motion, which the trial court granted.[32] The State's witness list did not include Decanini. Even so, trial counsel testified, "I didn't rely on their witness list. I went out and did my own work." He did not receive the report. Trial counsel learned from grand jury testimony that a report may have been destroyed. Referring to a report signed by both De Hoyos and Garcia, trial counsel testified he "asked if the State had in its possession that alleged report that was destroyed." He learned about Decanini the night before the motion for new trial hearing through conversing with current defense counsel. Trial counsel recalled De Hoyos's testimony at trial regarding an original report he prepared and officer Garcia signed. He further recalled testimony that officer Rodriguez claimed he did not have De Hoyos's original report, and so De Hoyos compiled a supplemental report. Trial counsel recalled that officer Garcia denied at trial that he signed a report compiled by De Hoyos. Decanini's testimony, in his opinion, had impeachment value. When asked if he would have called her as a witness *474 had he known about her, counsel answered, "If the State had . . . I would have, yes." The following colloquy ensured:
[Trial counsel]: I believe that there should have been some due diligence in trying to locate the original report.
[Post-trial defense counsel]: Right. And as the attorney in charge, you were never given this information regarding officer Decanini; is that correct?
[Trial counsel]: I don't believe they possessed it, and I wasn't given it. I believe if they had possessed it, I would have been given it.
On cross-examination, trial counsel testified that grand jury testimony from E. Jackson was that a report was "destroyed, altered or missing." Before trial, counsel knew: (1) about "an original report signed by both Mr. Flavio Garcia and Sergeant De Hoyos;" (2) officer Garcia testified he did not remember ever signing a report; (3) De Hoyos testified that he had prepared the original report; (4) De Hoyos did not testify that Decanini prepared it. Finally, when asked if the issue regarding an original report was addressed to the jury, trial counsel responded, "The issue about an original report, yes."
The trial court stated he presided over the jury trial and remembered the testimony.[33] The trial court denied the motion for new trial.

3. Analysis
Rodriguez argues that the State failed to disclose Decanini as a potential witness. Evidence at trial showed that De Hoyos testified he prepared an original report and that it was missing. The defense thoroughly cross-examined De Hoyos, officer Garcia, and officer Rodriguez about a missing report. At trial, officer Rodriguez denied he saw another report by De Hoyos, and officer Garcia denied he signed a report generated by De Hoyos. Decanini admitted that the report she typed did not contain language that officer Garcia concurred with the report. At trial, officer Rodriguez provided favorable testimony that Rodriguez passed the sobriety test.
Evidence at the motion for new trial hearing did not establish that the State knew about Decanini or had reason to believe that she was a potential witness. See Zule v. State, 802 S.W.2d 28, 33 (Tex. App.-Corpus Christi 1990, pet. ref'd). Whatever impeachment value Decanini's testimony might have had, other witnesses testified and were cross-examined extensively about the missing report and its contents and the replacement report which did not include officer Garcia's signature.
In light of the other evidence introduced at trial, I conclude that Rodriguez did not meet his burden of establishing the materiality of evidence of the destruction of De Hoyos's report, the basis for Decanini's testimony. See Hampton, 86 S.W.3d at 605. Similarly, I also conclude that Rodriguez did not meet his burden to show a reasonable probability that the result of the proceeding would have been different if the identity of Decanini as a potential witness, or her proffered testimony, had been disclosed earlier to the defense. See Ex parte Richardson, 70 S.W.3d at 870. I would overrule Rodriguez's ninth issue.

*475 C. Newly Discovered Evidence
By his tenth issue, Rodriguez argues that the State's failure to disclose the newly discovered evidence relating to Decanini mandates a new trial. In particular, he asserts that Decanini's testimony would have shown that officer Garcia in fact agreed that Rodriguez "passed all the exams and that [officer] Rodriguez was suppressing it." The State responds that the trial court properly denied the motion.

1. The Law
A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial. TEX.CODE CRIM. PROC. ANN. art. 40.001 (Vernon Supp.2004-05); see Brady, 373 U.S. at 87, 83 S.Ct. 1194. The party who moves for a new trial based on newly-discovered evidence must satisfy a four-part test: (1) the newly discovered evidence was unknown or unavailable to the accused at the time of his trial; (2) the accused's failure to discover or obtain the evidence was not due to a lack of diligence; (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in another trial. See Keeter v. State, 74 S.W.3d 31, 36-37 (Tex.Crim.App.2002); Drew, 743 S.W.2d at 226; Villarreal, 79 S.W.3d at 814.

2. Analysis
Rodriguez has not demonstrated that this "new" evidence of a missing report was unknown to him before the trial. See Villarreal, 79 S.W.3d at 814. Trial counsel testified at the motion for new trial hearing that, based on the record of the grand jury proceedings, he knew there was a missing report and discussed this with the prosecutor. During the motion to suppress hearing, De Hoyos testified about the missing report. Trial counsel also further testified that he did not rely on the State's witness list and did his own work. He further testified that he learned about Decanini the night before the motion for new trial hearing. I have already concluded that whatever impeachment value derived from the information Decanini proffered, other witnesses testified and were cross-examined extensively on the same subject at trial. In light of the other evidence introduced at trial and the evidence adduced at the motion for new trial hearing, I conclude that the evidence was not "newly discovered," but instead existed before trial, both through De Hoyos's pretrial testimony and through grand jury testimony. This was acknowledged by trial counsel. See Villarreal, 79 S.W.3d at 814. Further, Rodriguez did not establish (1) the failure to discover the "new" evidence was not due to a want of diligence on his part (see id.; see also Drew, 743 S.W.2d at 226); or (2) the "new evidence" was material; or (3) it was not merely cumulative, corroborative, collateral, or impeaching. Id. I would overrule Rodriguez's tenth issue.

D. Effective Assistance of Counsel
In his eleventh issue, Rodriguez argues that trial counsel was ineffective because he did not discover Decanini and her proffered evidence before trial.
In reviewing an ineffective assistance of counsel claim, we evaluate the effectiveness of counsel under the two-pronged test enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Hernandez v. State, 988 S.W.2d 770, 774 (Tex.Crim.App.1999). First, the defendant must show that his counsel's representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688, 104 S.Ct. 2052. To prove this deficiency in representation, the defendant must demonstrate that his counsel's performance deviated from prevailing *476 professional norms. Strickland, 466 U.S. at 688, 104 S.Ct. 2052; McFarland v. State, 845 S.W.2d 824, 842-43 (Tex. Crim.App.1992). Second, the defendant must show prejudice. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. This requires the defendant to show that there is a reasonable probability that but for his counsel's unprofessional errors the result of the proceeding would have been different. Id. at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. The failure to satisfy one prong of the Strickland test negates a court's need to consider the other. See id. at 697, 104 S.Ct. 2052. An appellant bears the burden of proving by a preponderance of the evidence that his counsel was ineffective. Thompson v. State, 9 S.W.3d 808, 813 (Tex.Crim.App.1999).
In his motion for new trial and at the motion for new trial hearing, Rodriguez did not assert that his trial counsel was ineffective. I have already concluded that Rodriguez has not shown that the outcome of the trial would have been different had Decanini's proffered evidence been discovered. I similarly conclude that, on this record, Rodriguez has not shown that, but for the complained of error, the result of the trial would have been different. Accordingly, Rodriguez has not met the first Strickland prong. See Strickland, 466 U.S. at 688, 104 S.Ct. 2052; see also Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim.App.1994). I would overrule Rodriguez's eleventh issue.

V. CONCLUSION
Having overruled Rodriguez's eleven issues, I concur with the majority's decision to affirm.
Dissenting Opinion by Chief Justice VALDEZ.
I respectfully dissent from the conclusion reached by the majority and would reverse and remand this case for a new trial. I reach this conclusion based on appellant's third issue, i.e., the trial court erred in denying appellant's motions to suppress due to an unlawful arrest.

Custody
Appellant argues that the actions of the police on the night of the accident constituted an improper arrest, and therefore all evidence relating to his arrest should have been suppressed as it was collected in violation of the U.S. Constitution and the Texas Code of Criminal Procedure.[1]See U.S. CONST. amend. IV, V, VI; TEX. CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005). Thus, in order to determine whether appellant's motions to suppress were wrongfully denied, this Court must first determine whether appellant was unlawfully arrested by the police. See TEX. CODE CRIM. PROC. ANN. art. 15.22 (Vernon 1977) (defining arrest as being placed under restraint or taken into custody by an officer or person with or without a warrant).
A determination of whether a person has been placed in custody must be made on an ad hoc basis in consideration of all of the objective circumstances of the arrest. See Dowthitt v. State, 931 S.W.2d 244, 255 (Tex.Crim.App.1996); Shiflet v. State, 732 S.W.2d 622, 629 (Tex.Crim.App.1985). A person is "in custody" only if, under the circumstances, a reasonable person would *477 believe that his freedom of movement was restrained to the degree associated with a formal arrest. Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). In determining whether a person is in custody, we consider the following: (i) probable cause to arrest, (ii) subjective intent of the police, (iii) focus of the investigation, and (iv) subjective belief of the defendant. See Dowthitt, 931 S.W.2d at 254 (citing Meek v. State, 790 S.W.2d 618, 621 (Tex.Crim.App. 1990)).
The court of criminal appeals has outlined four general situations which typically constitute custody: (i) when the suspect is physically deprived of his freedom of action in any significant way, (ii) when a law enforcement officer tells the suspect that he cannot leave, (iii) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (iv) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. See Shiflet, 732 S.W.2d at 629. With respect to the first three situations, the restriction upon freedom of movement "must amount to the degree associated with an arrest as opposed to an investigative detention." Dowthitt, 931 S.W.2d at 255. What begins as a noncustodial detention, however, may become a custodial arrest as a result of police conduct during the encounter. See id. In the fourth Shiflet scenario, the officers' knowledge of probable cause must be communicated or otherwise manifested to the suspect. See id. Custody is then established "if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." Id.
The length of time of a suspect's encounter with police officers, see id. at 256, the placement of a suspect in a police car and subsequent transportation to a police station, see State v. Consaul, 960 S.W.2d 680, 686 (Tex.App.-El Paso 1997), pet. dism'd, improvidently granted, 982 S.W.2d 899 (Tex.Crim.App.1998), and the use of handcuffs, see Ramirez v. State, 105 S.W.3d 730, 739 (Tex.App.-Austin 2003, no pet.), are all factors that may be considered when making a determination of whether a suspect is in custody.

Evidence Constituting Custody
Here, the circumstances of the disputed detention include the following: appellant was the driver of a motor vehicle involved in an accident that occurred under circumstances indicating that appellant was at fault; the police were called to the scene of the accident and saw several beer cans in appellant's vehicle; appellant was told by a police officer that the officer "would have to take [appellant] in;" appellant was placed in the patrol car and taken to the police station; and at the police station, appellant was taken through the entrance used for prisoners and was escorted to a holding room, where he was subsequently administered multiple sobriety tests, all of which he passed.[2] Appellant testified that throughout this time he did not feel free to leave. One of the officers involved in transporting appellant to the police station testified at the hearing on the motions to *478 suppress that appellant "was not allowed" to leave police presence and, had appellant shown any signs of resistance, he would have been handcuffed. Furthermore, once appellant was declared not to be intoxicated by the police chief and returned to his home, another police officer arrived at appellant's home some time later, performed three additional sobriety tests, and requested that he submit to a breath analysis.[3] Appellant, who had passed all sobriety tests administered both at the station and at his own home, refused to provide a breath sample, and his refusal to submit to the analysis was subsequently used against him at trial. Appellant was not given any Miranda warnings at the police station nor at the scene of the accident before being taken to the station. He was also not given the required statutory warnings involving a refusal to submit to a breathalyzer when confronted at his home.
I would conclude from this evidence that both the third and fourth Shiflet situations apply to the circumstances here; i.e., law enforcement officers created a situation that would have led a reasonable person in appellant's position to believe that his freedom of movement was significantly restricted; and initially, at least, there was manifest probable cause to arrest appellant and the officers did not tell him that he was free to leave. See Shiflet, 732 S.W.2d at 629. Furthermore, the State, by using appellant's refusal to submit to a breathalyzer exam against him in court, implicitly admitted that appellant was in fact under arrest and therefore in custody, as the relevant statutes only allow such evidence to be used against arrestees. See TEX. TRANSP. CODE ANN. § 724.012(a) (Vernon Supp.2004-05) (allowing a person's breath or blood to be tested if the person is arrested and operating a motor vehicle in a public place); id. § 724.012(b) (requiring a test for intoxication if an officer arrests a person for an offense under chapter 49 involving operation of a motor vehicle); id. § 724.015 (requiring officer to warn suspect that refusal to submit to testing is admissible in subsequent prosecution).
The court of criminal appeals has stated when applying an earlier but substantially similar version of the transportation statute: "The statute requires that consent be obtained from those individuals under arrest. However the statute has been construed to apply only to those persons under arrest, it does not apply to persons not under arrest." Aliff v. State, 627 S.W.2d 166, 169 (Tex.Crim.App.1982) (emphasis added); see also State v. Williams, 814 S.W.2d 256, 259 (Tex.App.-Austin 1991), aff'd, 832 S.W.2d 52 (Tex.Crim.App.1992). Nonetheless, a police officer came to appellant's home and attempted to obtain his consent to the breathalyzer procedure. Thus, the State, having treated appellant as an arrestee under the applicable transportation statutes, cannot now legitimately argue on appeal that appellant was never considered by police officers to have been under arrest on the night in question.
The State also argues on appeal that appellant was never officially arrested because he was not handcuffed and was never read his Miranda rights. However, handcuffing is not dispositive, see Ramirez, 105 S.W.3d at 739, and the officers involved testified in court that persons taken into custody who do not present a safety threat are not automatically handcuffed. With regard to the absence of Miranda warnings, we note that a failure to give a suspect his Miranda rights typically "results *479 in forfeiture of the use of any statement obtained during that interrogation by the prosecution during its case-in-chief," see Jones v. State, 119 S.W.3d 766, 772 (Tex.Crim.App.2003), and, therefore, such a failure is not and should not be considered a factor in determining whether a suspect is in custody, as such an argument would in fact defeat the purposes of the Miranda warnings. See Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); see also Janak v. State, 826 S.W.2d 803, 805 (Tex.App.-Texarkana 1992, no pet.) ("As the refusal to take a blood test is in the nature of an incriminating act ... evidence of it is not admissible unless the statutory warning was given.").

Custody Established
Having evaluated the circumstances of the investigation and detention, I would conclude that appellant was placed under arrest by police at the scene of the accident but was improperly not read any Miranda warnings. Therefore, all evidence related to the unlawful arrest, including evidence of appellant's refusal to take further sobriety tests and any testimony from police officers relating to the unlawful custody, should have been excluded as fruits of the poisonous tree. See Erdman v. State, 861 S.W.2d 890, 893-94 (Tex.Crim.App.1993) (holding that police must warn D.W.I. suspects correctly about the statutory consequences of refusal before introducing that refusal as evidence of intoxication); see also Sossamon v. State, 816 S.W.2d 340, 346 (Tex.Crim.App.1991); Corbin v. State, 91 S.W.3d 383, 385 (Tex. App.-Texarkana 2002, pet. denied).
Appellant was eventually released from this unlawful arrest. However, a police officer later came to appellant's home, confronted appellant again, performed additional sobriety tests, and requested a breath specimen. The State's own attorney, in his closing argument, noted that results from such a test would no longer be accurate given the time that had elapsed since the accident and initial detention of appellant: "Think about how much time elapsed .... Over an hour, folks. I mean, that's almost enough time for you to be at home and watch a DVD .... Plenty of time for somebody to sober up, to gather their thoughts. Plenty of time." Despite this, appellant's refusal to submit to the breathalyzer was used as evidence against him at trial. The police officer's appearance at appellant's home therefore served to effectively reinitiate custody, given that the statutes allowing this refusal to be used as evidence apply only to arrestees. See TEX. TRANSP. CODE ANN. §§ 724.012, 724.015. Such re-initiation of detention was clearly improper, given the lack of probable cause or reasonable suspicion coupled with the lack of properly administered statutory warnings concerning the consequences of such a refusal. See id. § 724.015.
We understand that "questions normally accompanying the processing of a D.W.I. arrestee do not constitute interrogation" sufficient to implicate the right to Miranda warnings. See Griffith v. State, 55 S.W.3d 598, 603 (Tex.Crim.App.2001). However, we see that in this case, the re-initiation of custody itself was the problem, as there was no probable cause to justify the additional intrusion, and any evidence following from this improper detention must therefore be excluded, as it is clearly not within the "normal . . . processing of a D.W.I. arrestee." See id.; see also id. at 601 n. 5.
I would conclude that a reasonable person under these circumstances would believe that he was under arrest throughout these police encounters. See Dowthitt, 931 S.W.2d at 255. Given the lack of Miranda warnings and the failure to permanently *480 release appellant following the police station's determination that he was not intoxicated, this arrest was improper and all evidence derived from the circumstances of the arrest should have been excluded at trial. See Corbin, 91 S.W.3d at 385; see also TEX.CODE CRIM. PROC. ANN. art. 38.23 ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution . . . shall be admitted in evidence against the accused"). Therefore, the trial court abused its discretion by denying appellant's motions to suppress and erred by allowing use of evidence derived from the arrest. See Oles v. State, 993 S.W.2d 103, 106 (Tex.Crim.App.1999) (establishing standard applied to review of motions to suppress evidence). Furthermore, I believe the contrary conclusion establishes a dangerous precedent in that the police, after investigating and determining that a suspect may be released to his home, could nonetheless legally appear on that suspect's doorstep later, demanding further tests be performed, then using that suspect's subsequent refusal as evidence of intoxication.

Harm Analysis
Having determined that the trial court's denial of appellant's motions to suppress was erroneous, I would further conclude that the evidence was harmful and led to reversible error, as the evidence improperly derived from the night of appellant's arrest made up the majority of the State's case against appellant. See TEX.R.APP. P. 44.2(b); see also Corbin, 91 S.W.3d at 385. Throughout closing arguments, the State also repeatedly emphasized appellant's refusal to take a breathalyzer test when confronted by police at his home, at one point explicitly noting: "If the defendant only had less than one beer as he claimed to have had, why did he refuse to take a breathalyser?" Had the evidence derived from the arrest and subsequent refusal to submit to breath analysis been suppressed, there would be no proof of appellant's alleged intoxication, which is a key element of the offense of intoxication manslaughter. See TEX. PEN.CODE ANN. § 49.07(a) (Vernon 2003); Janak, 826 S.W.2d at 805 ("There was no scientific evidence of [appellant]'s intoxication . . . Evidence that [he] refused to take blood test was thus . . . harmful."). Without this evidence, there would also be no direct evidence that appellant, by reason of intoxication, caused the accident in question, which is also a necessary element of the offense charged. See TEX. PEN.CODE ANN. § 49.07(a); see also Badgett v. State, 42 S.W.3d 136, 139 (Tex.Crim.App.2001).

Conclusion
Accordingly, I would reverse and remand for a new trial. See Ford v. State, 158 S.W.3d 488, 494 (Tex.Crim.App.2005) (remanding case following finding of erroneous denial of motion to suppress).
Justice RODRIGUEZ joins in this dissent.
NOTES
[1] See TEX. PEN.CODE ANN. § 49.07(a)(1) (Vernon 2003).
[2] Because appellant's testimony and the testimony of others are discussed in greater detail below, we limit our discussion in this section to a brief chronology of events, taken primarily from the testimony of the police officers investigating the accident.
[3] Escamilla v. State, 143 S.W.3d 814, 817 (Tex.Crim.App.2004) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
[4] Jackson, 443 U.S. at 319, 99 S.Ct. 2781.
[5] See Malik v. State, 953 S.W.2d 234, 240 (Tex.Crim.App.1997); Adi v. State, 94 S.W.3d 124, 131 (Tex.App.-Corpus Christi 2002, pet. ref'd).
[6] Malik, 953 S.W.2d at 240.
[7] Booker v. State, 929 S.W.2d 57, 60 (Tex. App.-Beaumont 1996, pet. ref'd).
[8] TEX.CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1981); Chambers v. State, 805 S.W.2d 459, 461 (Tex.Crim.App.1991).
[9] Penagraph v. State, 623 S.W.2d 341, 343 (Tex.Crim.App.1981).
[10] Escamilla, 143 S.W.3d at 817 (citing Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim.App.2004)).
[11] Johnson v. State, 23 S.W.3d 1, 10-12 (Tex. Crim.App.2000).
[12] Id.
[13] See TEX. PEN.CODE ANN. § 49.07(a)(1) (Vernon 2003).
[14] See id.
[15] Johnson, 23 S.W.3d at 7.
[16] See U.S. CONST. amend. IV; TEX.CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005).
[17] See Ford v. State, 26 S.W.3d 669, 672 (Tex. App.-Corpus Christi 2000, no pet.) (citing Oles v. State, 993 S.W.2d 103, 106 (Tex.Crim.App. 1999)).
[18] State v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim.App.1999).
[19] State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim.App.2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App.1997).
[20] Ross, 32 S.W.3d at 856; Guzman, 955 S.W.2d at 89.
[21] Ross, 32 S.W.3d at 856; Guzman, 955 S.W.2d at 89.
[22] Villarreal v. State, 935 S.W.2d 134, 138 (Tex.Crim.App.1996).
[23] See Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[24] Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).
[25] See State v. Stevenson, 958 S.W.2d 824, 828-29 (Tex.Crim.App.1997).
[26] Galloway v. State, 778 S.W.2d 110, 112 (Tex.App.-Houston [14th Dist.] 1989, no pet.).
[27] Abernathy v. State, 963 S.W.2d 822, 824 (Tex.App.-San Antonio 1998, pet. ref'd).
[28] Lewis v. State, 72 S.W.3d 704, 707 (Tex. App.-Fort Worth 2002, pet. ref'd) (citing Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam)).
[29] Id.
[30] Id. (citing Dowthitt v. State, 931 S.W.2d 244, 255 (Tex.Crim.App.1996)).
[31] Id.
[32] Medford v. State, 13 S.W.3d 769, 773 (Tex. Crim.App.2000). Article 15.22 of the code of criminal procedure provides: "[a] person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without a warrant." However, this is not a controlling legal definition of "arrest." Id. at 773-74; see TEX.CODE CRIM. PROC. ANN. art. 15.22 (Vernon 2005).
[33] Medford, 13 S.W.3d at 773 (citing U.S. v. Corral-Franco, 848 F.2d 536, 540 (5th Cir. 1988)).
[34] Id. at 773-74.
[35] Dowthitt, 931 S.W.2d at 255.
[36] Id.
[37] Id.
[38] Stevenson, 958 S.W.2d at 829.
[39] See id. at 829 n. 7; Lewis, 72 S.W.3d at 712.
[40] See, e.g., Rhodes v. State, 945 S.W.2d 115, 118 (Tex.Crim.App.1997) (holding no brightline rule exists providing that handcuffing is always the equivalent of arrest and that Rhodes was not under arrest when officers handcuffed him); Mays v. State, 726 S.W.2d 937, 943-44 (Tex.Crim.App.1986) (holding officer's handcuffing of two suspects for his own safety did not at that point, under the circumstances, constitute an arrest).
[41] Anderson v. State, 932 S.W.2d 502, 505 (Tex.Crim.App.1996).
[42] California v. Beheler, 463 U.S. 1121, 1124-25, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); Dancy v. State, 728 S.W.2d 772, 778 (Tex. Crim.App.1987).
[43] State v. Rodriguez, 986 S.W.2d 326, 329 (Tex.App.-El Paso 1999, pet. ref'd).
[44] Davis v. State, 947 S.W.2d 240, 245 (Tex. Crim.App.1997).
[45] Id. (quoting Perez v. State, 818 S.W.2d 512, 517 (Tex.App.-Houston [1st Dist.] 1991, no pet.)).
[46] Joseph v. State, 865 S.W.2d 100, 102 (Tex. App.-Corpus Christi 1993, pet. ref'd).
[47] Burkes v. State, 830 S.W.2d 922, 925 (Tex. Crim.App.1991).
[48] Chief Rodriguez testified that he did not order any of the officers at the scene to refrain from calling DPS. He testified that a DPS trooper eventually came to the station, approximately thirty minutes after appellant was released.
[49] Officer De Hoyos testified that he conducted the field sobriety tests on appellant at the station, even though he is not certified to conduct such tests.
[50] Appellant testified that although two passengers were riding in the back seat of the van, he was alone in the front seat.
[51] Cano testified that when Perez was removed from beneath the van, her left leg was over her right shoulder. Perez testified that her upper leg was broken, her lower leg was broken in two places, her foot was almost severed, and that she suffered multiple burns on her legs. She was hospitalized for approximately four weeks and underwent numerous surgeries and skin grafts. At the time of trial, approximately seven months after the accident, she was able to walk only short distances with the aid of a walker.
[52] See Davis, 947 S.W.2d at 245.
[53] See id.
[54] See TEX. TRANSP. CODE ANN. § 545.351(b)(2) (Vernon 1999) (operator shall control vehicle speed as needed to avoid colliding with another vehicle); Maxcey v. State, 990 S.W.2d 900, 903 (Tex.App.-Houston [14th Dist.] 1999, no pet.).
[55] See Tex. Dep't of Pub. Safety v. Rodriguez, 953 S.W.2d 362, 364 (Tex.App.-Austin 1997, no pet.).
[56] See Amores v. State, 816 S.W.2d 407, 411 (Tex. Crim.App.1991).
[57] Id. at 413.
[58] See TEX. PEN.CODE ANN. § 49.02(a) (Vernon 2003).
[59] See id.
[60] See Britton v. State, 578 S.W.2d 685, 687 (Tex.Crim.App.1978).
[61] Id.
[62] See Carrasco v. State, 712 S.W.2d 120, 122 (Tex.Crim.App.1986) (holding probable cause existed to believe driver involved in a one-car accident posed danger to herself or others for purposes of arrest for public intoxication, where officers observed symptoms of intoxication in driver); Segura v. State, 826 S.W.2d 178, 184-85 (Tex.App.-Dallas 1992, pet. ref'd) (holding officer's testimony that driver of car involved in accident was unsteady, had bloodshot eyes, slurred speech, and alcohol on breath was sufficient probable cause to arrest for public intoxication).
[63] See TEX.CODE CRIM. PROC. ANN. art. 14.01(b) (Vernon 2005) (peace officer may arrest offender without warrant for any offense committed in his presence or within his view).
[64] Because appellant was standing outside his vehicle, we need not determine whether, under these circumstances, the vehicle was a "public place." We note that whether a vehicle on a public road or highway is a public place is a question of fact. See Kirtley v. State, 585 S.W.2d 724, 726 (Tex.Crim.App. 1979); Gallagher v. State, 778 S.W.2d 153, 154-55 (Tex.App.-Houston [1st Dist.] 1989, no pet.) (holding there was sufficient evidence to support probable cause to arrest passenger for public intoxication where officer pulled car into parking lot near a busy boulevard after citizen complained the driver and passenger left a restaurant intoxicated).
[65] See Carrasco, 712 S.W.2d at 122; Segura, 826 S.W.2d at 184-85.
[66] See Anderson, 932 S.W.2d at 506 (holding evidence obtained pursuant to legal arrest was not fruit of illegal arrest); Warrick v. State, 634 S.W.2d 707, 709 (Tex.Crim.App. 1982) (holding evidence found as a result of lawful arrest for public intoxication was admissible).
[67] It is undisputed that the police did not give appellant the post-arrest warnings required by Miranda. See Miranda, 384 U.S. at 444, 86 S.Ct. 1602.
[68] The "fruit of the poisonous tree" doctrine holds that evidence otherwise admissible but discovered as a result of an earlier violation is excluded as tainted. See Missouri v. Seibert, 542 U.S. 600, 612, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).
[69] See U.S. CONST. amend. IV.
[70] See TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005).
[71] The videotape shown to the jury involves only the recorded conversation between appellant and Officer Garcia while appellant was being transported to the police station. Because the video camera was directed to the front of the vehicle, the video footage simply reflects the scenery en route to the police station. Thus, only the "audio" portion of the videotape is at issue here.
[72] See Miranda, 384 U.S. at 444, 86 S.Ct. 1602.
[73] See Rhode Island v. Innis, 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).
[74] Id. at 300, 100 S.Ct. 1682; Jones v. State, 795 S.W.2d 171, 174-75 (Tex.Crim.App. 1990).
[75] Pennsylvania v. Muniz, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (citations omitted); Jones, 795 S.W.2d at 174.
[76] Innis, 446 U.S. at 301, 100 S.Ct. 1682.
[77] Jones, 795 S.W.2d at 174 n. 3.
[78] Miranda, 384 U.S. at 478, 86 S.Ct. 1602.
[79] Id. at 449-51, 86 S.Ct. 1602.
[80] Stevens v. State, 671 S.W.2d 517, 520 (Tex. Crim.App.1984).
[81] TEX.CODE CRIM. PROC. ANN. art. 38.22 §§ 2, 3, 5 (Vernon 2005); State v. Waldrop, 7 S.W.3d 836, 838 (Tex.App.-Austin 1999, no pet.).
[82] TEX.CODE CRIM. PROC. ANN. art. 38.22 §§ 2, 3 (Vernon 2005).
[83] Id. § 5 (Vernon 2005); Galloway, 778 S.W.2d at 112.
[84] Waldrop, 7 S.W.3d at 839; Gruber v. State, 812 S.W.2d 368, 371 (Tex.App.-Corpus Christi 1991, pet. ref'd) (holding statement which is volunteered and not the product of custodial interrogation is admissible).
[85] See Waldrop, 7 S.W.3d at 839.
[86] The videotape was played for the jury and this Court has reviewed it. Although the audio portion of the tape is difficult to understand, appellant does not challenge that the videotape accurately reflects his conversation with Garcia.
[87] See Waldrop, 7 S.W.3d at 839.
[88] Muniz, 496 U.S. at 584, 110 S.Ct. 2638.
[89] Id. at 592, 110 S.Ct. 2638.
[90] Id. at 586, 110 S.Ct. 2638.
[91] Id. at 604 n. 19, 110 S.Ct. 2638.
[92] See id.; see also Griffith v. State, 55 S.W.3d 598, 603 (Tex.Crim.App.2001) (holding admission into evidence of defendant's refusal to submit to blood-alcohol test does not offend right against self-incrimination); Miffleton v. State, 777 S.W.2d 76, 79-80 (Tex.Crim.App. 1989) (a defendant's verbal refusal to submit to a breath test does not fall within state privilege against self-incrimination where defendant is not physically or mentally compelled to refuse the test).
[93] Appellant denied that he was asked to submit to a breath test at his residence.
[94] Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).
[95] Hartman v. State, 144 S.W.3d 568, 573 n. 3 (Tex.App.-Austin 2004, no pet.) (citing Davis, 947 S.W.2d at 243); see also State v. Thirty Thousand Six Hundred Sixty Dollars, 136 S.W.3d 392, 403 (Tex.App.-Corpus Christi 2004, pet. denied) (holding that after suspect passed field sobriety test, officer's original suspicion that suspect was intoxicated was dispelled and the purpose of the investigative detention was fulfilled).
[96] See Davis, 947 S.W.2d at 240.
[97] See id. at 241.
[98] Id. at 245.
[99] See id.
[100] See King v. State, 953 S.W.2d 266, 271 (Tex.Crim.App.1997); Gigliobianco v. State, 179 S.W.3d 136, 145 (Tex.App.-San Antonio 2005, no pet.); Schaum v. State, 833 S.W.2d 644, 647 (Tex.App.-Dallas 1992, no pet.) (proper to use harm analysis if trial court admits evidence of refusal to submit breath or blood specimen, even though written warning required by statute not given).
[101] See TEX.R.APP. P. 44.2(b); Solomon v. State, 49 S.W.3d 356, 365 (Tex.Crim.App. 2001).
[102] Bagheri v. State, 119 S.W.3d 755, 763 (Tex.Crim.App.2003).
[103] Id. (citing Motilla v. State, 78 S.W.3d 352, 355-56 (Tex.Crim.App.2002)).
[104] Id.
[105] Id.
[106] See Solomon, 49 S.W.3d at 365.
[107] See TEX.R.APP. P. 44.2(b); King v. State, 953 S.W.2d 266, 271-73 (Tex.Crim.App. 1997).
[108] See TEX. TRANSP. CODE ANN. § 724.012 (Vernon Supp.2005).
[109] See id. § 724.015 (Vernon Supp.2005).
[110] See TEX.R.APP. P. 47.1.
[111] See Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Crim.App.1990).
[112] State v. Mechler, 153 S.W.3d 435, 439 (Tex.Crim.App.2005).
[113] Burden v. State, 55 S.W.3d 608, 615 (Tex. Crim.App.2001).
[114] TEX.R. EVID. 401; Moses v. State, 105 S.W.3d 622, 626 (Tex.Crim.App.2003).
[115] See Webb v. State, 991 S.W.2d 408, 418 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd).
[116] See id.
[117] See id.
[118] Salazar v. State, 38 S.W.3d 141, 148 (Tex. Crim.App.2001).
[119] Guzman, 955 S.W.2d at 89; Jennings v. State, 107 S.W.3d 85, 89-90 (Tex.App.-San Antonio 2003, no pet.).
[120] Jennings, 107 S.W.3d at 90 (citing Guzman, 955 S.W.2d at 89).
[121] State v. Read, 965 S.W.2d 74, 77 (Tex. App.-Austin 1998, no pet.).
[122] Id.
[123] See Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that the State has an affirmative duty to make exculpatory evidence in its possession available to an accused).
[124] Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[125] See Thompson v. State, 9 S.W.3d 808, 812 (Tex.Crim.App.1999).
[126] Id.
[127] Id.
[128] Id.
[129] Id.
[130] Id.
[131] Id.
[132] Id. at 813.
[133] Id.
[134] McFarland v. State, 928 S.W.2d 482, 500 (Tex.Crim.App.1996).
[135] Mitchell v. State, 68 S.W.3d 640, 642 (Tex.Crim.App.2002).
[136] See Miranda, 384 U.S. at 444, 86 S.Ct. 1602.
[137] Article 38.23 is the state exclusionary rule. See TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005) (evidence obtained in violation of state or federal constitutions or laws is inadmissible against the accused).
[138] Sossamon v. State, 816 S.W.2d 340, 349 (Tex.Crim.App.1991).
[139] Id.
[140] Id.; See U.S. CONST. amend. V.
[141] Corbin v. State, 91 S.W.3d 383, 385 (Tex. App.-Texarkana 2002, pet. denied).
[142] See TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005).
[143] Baker v. State, 956 S.W.2d 19, 24 (Tex. Crim.App.1997).
[144] See U.S. v. Patane, 542 U.S. 630, 637, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (holding failure to give suspect Miranda warnings did not require suppression of physical fruits of suspect's unwarned but voluntary statement).
[145] Oregon v. Elstad, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).
[146] Id. We note that in Seibert, the U.S. Supreme Court invalidated the "question first" technique of interrogation, in which the police intentionally interrogate suspects without warnings, obtain confessions, and then, after providing the required Miranda warnings, interrogate the suspects again to obtain a second confession for use in court. See Seibert, 542 U.S. at 616, 124 S.Ct. 2601.
[147] Baker, 956 S.W.2d at 22.
[148] Id.
[1] See TEX. PEN.CODE ANN. § 49.07(a)(1) (Vernon 2003).
[2] After the State rested its case during the culpability phase, the trial court granted Rodriguez's motion for acquittal as to one count of aggravated assault.
[3] By his first and second issues, Rodriguez argues legal and factual insufficiency of the evidence. By his third and fourth issues, he asserts the trial court erred in denying his motion to suppress based on an unlawful arrest and unlawful detention. By his fifth, sixth, and seventh issues, he argues the trial court erred in not suppressing the videotape and the breath test. By his eighth issue, he argues the trial court erred by excluding relevant evidence. By his ninth and tenth issues, Rodriguez argues the trial court erred by denying his motion for new trial based on Brady violations and newly discovered evidence. By his eleventh issue, he asserts that his trial counsel was ineffective.
[4] Perez testified she had driven motorcycles for approximately thirty-seven years, and doing so was a way of life for her family, a hobby, and a stress reliever.
[5] Cano testified the brand of beer in the front of the van differed from the brand of beer located in the rear.
[6] Cano explained that he installed his own camera on the unit dashboard for his personal safety and for training purposes.
[7] Evidence showed that witnesses with the last name of Rodriguez are not related.
[8] The testimony of an officer that a person is intoxicated provides sufficient evidence to establish the element of intoxication. Gruber v. State, 812 S.W.2d 368, 370 (Tex.App.-Corpus Christi 1991, pet. ref'd) (citing Annis v. State, 578 S.W.2d 406, 407 (Tex.Crim.App.1979) and Whisenant v. State, 557 S.W.2d 102, 105 (Tex.Crim.App.1977)).
[9] The tests included the horizontal gaze nystagmus, one leg balance, and heel-to-toe tests.
[10] When asked why his police report showed an "hour and twenty minutes," officer Rodriguez explained he was engaged in discussions with Rodriguez and Jackson. Both Rodriguez and Jackson testified that, when officer Rodriguez arrived, they asked him about the victim's condition.
[11] Rodriguez does not contest the serious bodily injury element. The penal code defines "serious bodily injury" as an "injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." TEX. PEN. CODE ANN. § 49.07(b) (Vernon 2003).
[12] As grounds, the motion requested the trial court to suppress "all evidence seized as a result of the arrest of Defendant and the search of Defendant as well as all statements, either written or oral, made after such arrest."
[13] Article 38.22 governs the use of oral statements of the accused made as the result of custodial interrogation. TEX.CODE CRIM. PROC. ANN. art. 38.22(3) (Vernon 2005).
[14] Article 38.23(a) states, in relevant part, "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005).
[15] Rodriguez did not object when the State reintroduced the suppression issues and, indeed, fully participated in the relitigation of the issues in his cross-examination of the State's witnesses.
[16] Defense counsel conceded during argument in the suppression hearing that "this isn't a standard protocol case." The trial court responded, "Because it involves a judge."
[17] De Hoyos testified at trial that, because of Rodriguez's position as a municipal judge, he did not want to subject him to sobriety testing at the scene in front of bystanders.
[18] However, officer Garcia testified that Rodriguez walked around freely and, when De Hoyos arrived, Rodriguez met with De Hoyos and the police chief in De Hoyos' office.
[19] By contrast, at trial, Rodriguez testified he was released and then asked Jackson, who was outside with Rodriguez's son, for a ride home.
[20] The Texas Transportation Code provides that a person arrested for DWI must be informed that, if the person is 21 years of age or older, submits to the taking of a specimen, and the specimen shows that the person had an alcohol concentration of a level specified by Chapter 49 of the Texas Penal Code, then the person's license to operate a motor vehicle will automatically be suspended for not fewer than 90 days. See TEX. TRANSP. CODE ANN. § 724.015(3) (Vernon Supp.2004-05). A person must also be warned that two specific consequences will result from a refusal to submit to a breath test: (1) the person's driver's license will be suspended automatically for not fewer than 180 days; and (2) evidence of the refusal is admissible against the person in court. TEX. TRANSP. CODE ANN. § 724.015(1), (2) (Vernon Supp.2004-05).
[21] The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. CONST. amend. IV; see also TEX.CODE.CRIM. PROC. ANN. art. 38.23 (Vernon 2005).
[22] See Nenno v. State, 970 S.W.2d 549, 557 (Tex.Crim.App.1998), overruled on other grounds, State v. Terrazas, 4 S.W.3d 720, 725 (Tex.Crim.App.1999) (en banc) (noting that a one hour interview is a short time period).
[23] See TEX. PEN.CODE ANN. § 49.07(b) (Vernon 2003).
[24] Texas Transportation Code section 724.011 states:

If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place, or a watercraft, while intoxicated, or an offense under section 106.41, Alcoholic Beverage Code, the person is deemed to have consented, subject to this chapter, to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration or the presence in the person's body of a controlled substance, drug, dangerous drug, or other substance.
TEX. TRANSP. CODE ANN. § 724.011 (Vernon 1999).
[25] Section 724.061 states:

A person's refusal of a request by an officer to submit to the taking of a specimen of breath or blood, whether the refusal was express or the result of an intentional failure to give the specimen, may be introduced into evidence at the person's trial.
TEX. TRANSP. CODE ANN. § 724.061 (Vernon 1999).
[26] The defense theory was that Rodriguez was charged for political reasons, not because he was guilty, and "someone took advantage and tried to politicize a tragic event."
[27] An abuse of discretion occurs when the trial court acts arbitrarily or unreasonably, without reference to guiding rules or principles. Montgomery v. State, 810 S.W.2d 372, 379 (Tex.Crim.App.1990). In other words, an abuse of discretion occurs only when the trial court's decision is so wrong as to lie outside that zone within which reasonable persons might disagree. Id.
[28] Favorable evidence is any evidence, if disclosed and used effectively, that may make the difference between conviction and acquittal. Thomas v. State, 841 S.W.2d 399, 404 (Tex.Crim.App.1992). Favorable evidence includes both exculpatory and impeachment evidence. Wyatt v. State, 23 S.W.3d 18, 27 (Tex.Crim.App.2000); Thomas, 841 S.W.2d at 404. Exculpatory evidence is that which tends to justify, excuse, or clear the accused of fault or guilt. Id. Impeachment evidence is that which disputes, disparages, denies, or contradicts a witness's testimony. Id. Evidence is material if it creates a probability sufficient to undermine confidence in the outcome of the proceeding. Id. An appellant must also show that the State's nondisclosure or tardy disclosure prejudiced the defense. Little v. State, 991 S.W.2d 864, 867 (Tex.Crim. App.1999). To show prejudice, an appellant must show a reasonable probability that the result of the proceeding would have been different had the State timely disclosed the evidence to the defense. Id. at 866.
[29] The time for filing motions for new trial and amended motions for new trial in criminal cases is presently governed by Texas Rule of Appellate Procedure 21.4. See TEX.R.APP. P. 21.4. Under ordinary statutory construction, we apply the plain meaning of the words contained in the rule unless such application would lead to an absurd result. State v. Hardy, 963 S.W.2d 516, 519 (Tex.Crim.App.1997). The rule does not authorize an amendment of a motion after the thirty days have expired, even with leave of court. Id.; see also Drew v. State, 743 S.W.2d 207, 222-23 (Tex.Crim.App. 1987) (en banc) (construing former rule). Judgment below was entered on June 28, 2002. Rodriguez's amended motion for new trial, filed on July 29, 2002, was timely because the thirtieth day, July 28, fell on a Sunday.
[30] At the hearing, Decanini recanted the following statement in her motion for new trial affidavit: "I was advised by Judge Rodriguez [appellant] about some reports that were never brought up on the last trial he had...." She later testified that everything in the affidavit was correct.
[31] Decanini had been employed with the police department three months in November 2001, admittedly learning departmental policies and procedures during that time. Her duties at the time were to assist in the preparation of reports.
[32] He testified that three attorneys represented Rodriguez during trial. Different counsel represented Rodriguez during post-trial proceedings.
[33] During argument at the motion for new trial hearing, the trial court addressed Rodriguez's post-trial counsel stating, "[y]ou weren't here at the time of trial, but I can assure you it was exhausted to no end, almost to the point of having nausea regarding a missing report. If you'll look at the transcript of the trial ." Similarly, we may take judicial notice of its records in the same, or related proceedings involving the same or nearly the same parties. Huffman v. State, 479 S.W.2d 62, 68 (Tex.Crim.App.1972).
[1] The majority opinion discusses the proper standard of review applied when analyzing a trial court's decision on a motion to suppress, which we also apply. See Oles v. State, 993 S.W.2d 103, 106 (Tex.Crim.App.1999); Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim. App.1997).
[2] Although these station-house tests were not administered by officers specially certified in sobriety testing, the officer administering the tests at the police station testified that he frequently administered sobriety tests during investigations of intoxicated suspects and had nine years' experience in administering such tests. There was no evidence presented to show that these tests were unreliable in any way due to the officer's lack of a special certification.
[3] There is conflicting testimony in the record as to whether appellant was asked to give a breath sample while still at the station house. However, there is no dispute that appellant passed several sobriety tests and was considered sober by the chief of police.